**George ARTHUR, et al., Plaintiffs,**

v.

**Ewald P. NYQUIST, et al., Defendants.**

**No. Civ–1972–325C**

United States District Court,
W.D. New York.

Aug. 26, 1985.

David Gerald Jay, Buffalo, N.Y., for plaintiffs.

Aubrey McCutcheon, Special Counsel for Buffalo Bd. of Educ., Detroit, Mich. for defendants Superintendent of Schools Eugene T. Reville and Bd. of Educ.

Offermann, Fallon, Mahoney & Cassano, Buffalo, N.Y. (Christ Gaetanos, Buffalo, N.Y., of counsel), Local Counsel for Bd. of Educ.

Raichle, Banning, Weiss & Halpern, Buffalo, N.Y. (Frank G. Raichle and Arnold Weiss, Buffalo, N.Y., of counsel), for defendant Mayor James D. Griffin.

Falk & Siemer, Buffalo, N.Y. (Alvin M. Glick, Buffalo, N.Y., of counsel), for de-

fendant Common Council of City of Buffalo.

Jaeckle, Fleischmann & Mugel, Buffalo, N.Y. (J. Edmund deCastro, Buffalo, N.Y., of counsel), for plaintiff-intervenor Community Advisory Bd. for Bilingual Educ. of Buffalo.

Bouvier, O'Connor, Cegielski & Levine, Buffalo, N.Y. (Bruce A. Goldstein, Buffalo, N.Y., of counsel), for plaintiff-intervenor John Bushey.

Bruce Fenwick and Robert Clearfield, Buffalo, N.Y., for defendant-intervenor Buffalo Teachers Federation.

Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N.Y. (John R. LoGalbo, Buffalo, N.Y., of counsel), for defendant-intervenor Buffalo Council of Supervisors and Adm'rs.

CURTIN, Chief Judge.

### I.

On May 16, 1985, the Honorable Edmund F. Maxwell, United States Magistrate, filed a report concerning the school budget dispute between the Mayor of the City of Buffalo and the City's Board of Education. Magistrate Maxwell's report came after a lengthy evidentiary hearing upon two motions filed by the Board. In these motions, the Board asked the court for orders compelling the City[1] to appropriate funds which the Board contended were necessary

for it to comply with prior orders of this court concerning the desegregation of the Buffalo Public Schools. The disputed funds related to the 1983–84 and 1984–85 school years. The court designated Magistrate Maxwell to serve as a special master in connection with these motions pursuant to Fed.R.Civ.P. 53(a) and 28 U.S.C. § 636(b)(2).[2] See, Order of July 25, 1984. Today the court announces that it shall adopt the findings and recommendations set forth in Magistrate Maxwell's comprehensive and careful report.

### II.

The long history of this case can be gleaned from various orders of the court,[3] and there is no need for a detailed reiteration of it here. Only certain aspects of this lawsuit's recent history need be recounted.

In the summer of 1982, the court held an evidentiary hearing upon the plaintiffs' motion (joined by the Board) to compel the City to make an additional $7,400,000 available to the Board for the purpose of operating the Buffalo Public Schools during the 1982–83 school year. On August 27, 1982, the court issued its decision granting this motion. 547 F.Supp. 468. This order was the first of its kind in this case. There had been budget disputes between the Board and the City before, but these had been resolved without the court's intervention.

---

**1.** "City" here refers to the executive and legislative bodies of the City government; i.e., the Mayor and the Common Council. The Mayor and the Common Council stood together in opposing the Board's requests until the Common Council later broke with the Mayor and joined the Board in agreeing to a compromise figure in an attempt to settle this dispute.

**2.** 28 U.S.C. § 636(b)(2) reads as follows:

A judge may designate a magistrate to serve as a special master pursuant to the applicable provisions of this title and the Federal Rules of Civil Procedure for the United States district courts. A judge may designate a magistrate to serve as a special master in any civil case, upon consent of the parties, without regard to the provisions of rule 53(b) of the Federal Rules of Civil Procedure for the United States district courts.

**3.** See, especially, 415 F.Supp. 904 (W.D.N.Y. 1976), aff'd in part, rev'd in part, remanded in part, 573 F.2d 134 (2d Cir.), cert. denied sub nom. Manch v. Arthur, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978) (findings of fact and conclusions of law on liability issues); 473 F.Supp. 830 (W.D.N.Y.1979) (determining that a systemwide remedy is required); 514 F.Supp. 1133 (1981) (approving Phase IIIx of remedial plan); 547 F.Supp. 468 (1982), aff'd, 712 F.2d 809 (2d Cir.1983), cert. denied sub nom. Griffin v. Board of Education, — U.S. —, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984) (granting Board's motion for increased appropriation for 1982–83 school year); 566 F.Supp. 511 (W.D.N.Y.1983) (denying plaintiffs' motion to require Board to devise a new plan to desegregate three remaining racially identifiable elementary schools).

It was with great reluctance that I issued that order. *See, id.,* at 484 n. 17.

The City appealed from the August 1982 order. While the appeal was pending, the Board filed another motion, this time asking for more money for the 1983–84 school year. The Court of Appeals affirmed this court's decision, but noted that the findings upon which my decision was based were only "marginally sufficient." 712 F.2d 809, 814 (2d Cir.1983). This statement, and others made by the Second Circuit, heightened my already great reluctance to see the present budget battles left unresolved by the principals engaged in them.

Negotiations between the City and the Board continued from the time the Court of Appeals issued its decision affirming my order (*i.e.,* July 22, 1983) until the following summer, when I referred the matter to Magistrate Maxwell. The court met several times with lawyers for the City and the Board. Staff members of the Mayor's office and the Board, along with members of the Common Council, attended and participated in some of the meetings with the court. Eventually, I became dissatisifed with the progress of these negotiations.

My determination to have this matter resolved without a hearing was expressed in an order creating a Budget Review Committee headed by the Honorable Charles S. Desmond, retired Chief Judge of the New York Court of Appeals. This order was issued on April 10, 1984. In addition to Judge Desmond, the Committee's members were attorney James L. Magavern, William D. Mahaney, C.P.A.; Randolph A. Marks, retired president of the Computer Task Group; and Robert H. Rossberg, professor of education at the State University of New York at Buffalo. The Committee's task was to mediate the dispute. It held several meetings with the Board and the City but was unable to bring about a settlement. Nonetheless, the Committee issued a most insightful report, discussing what it perceived as the central issues in this dispute.

The Committee's substantial contribution to the court's effort is discussed at pages 829–830 of Magistrate Maxwell's report. The court at this time takes the opportunity to express its most sincere gratitude to the members, who assumed their tasks as mediators voluntarily and performed them effectively. It is now known that the Board and the City have reached an agreement on the budget for the 1985–86 school year.[4] This, of course, is the most appropriate way to decide upon a school budget. This state of affairs has come about as a result of a long process, for which many persons deserve credit. The members of the Budget Review·Committee were, in the court's mind, important factors in that process.

Magistrate Maxwell presided over the proceedings on these motions from the day he was designated as Special Master until he issued his report on May 16 of this year. Evidently, the Magistrate encouraged the parties not to abandon hopes of a settlement. The Magistrate's efforts in this regard were not very far wide of the mark: the Board, the Common Council, and the plaintiffs agreed upon a settlement which fell short of resolving the matter only because the Mayor did not concur in a settlement agreement reached by the Board and the Common Council on February 15, 1985.

---

4. On July 17, 1985, a document entitled "Memorandum of Understanding" was filed with the court. The memorandum was signed by counsel for the Common Council of the City of Buffalo and the Board of Education. It was also signed by two councilmen, George K. Arthur and Vincent J. LoVallo, and by the Board's Superintendent, Eugene T. Reville, and its President, Mozella Richardson. The memorandum reflected an agreement reached earlier by the Board and the Common Council. The Common Council agreed to increase the Mayor's proposed budget for the 1985–86 school year to $200.1 million from $196.1 million. The Board has agreed that it will not seek the court's intervention if it obtains an additional $4 million which it anticipates will come from the federal government. There is sufficient support on the Common Council to override a veto from the Mayor, who is not a party to the Memorandum of Understanding.

The memorandum is noted here for informational purposes only. It is not in evidence in the matter now pending, and it has had no bearing upon the decision on these motions.

All parties except the Mayor agreed that $186.6 million was sufficient for operating the schools for the 1984–85 school year.

Magistrate Maxwell's report came at the conclusion of 50 days of hearing testimony. The 92-page report discusses the budget process in considerable detail. In an even-handed manner, the Magistrate discusses the Board's extremely deficient accounting and reporting proceedings and the City's persistent failure to educate itself on matters relating to developing the budget of a school district which must operate under a series of desegregation orders. The Board, the Common Council, and the plaintiffs have urged the court to adopt Magistrate Maxwell's report without modification. The Mayor has filed objections to the report and contends that these motions should be denied. Oral argument upon the Mayor's objections was held on July 8.

### III.

The City's principal argument is that the Board has failed to sustain its burden of proving that it needs more money to operate the schools than the City is willing to appropriate. The City also contends that the Magistrate erroneously "shifted" the burden of proof from the Board to the City.

This court's only previous decision resolving a school budget dispute made several references to the Board's burden on a motion of this sort. For example, the court stated that:

> [B]efore this court can order the Mayor and the Common Council to provide additional funds to the Board of Education, the Board has the burden of showing that these funds are necessary to insure compliance with our orders and with the orders of the United States Court of Appeals for the Second Circuit.

547 F.Supp. at 472.

■ It is interesting to note that the phrase "burden of proof" was not used at all by the Court of Appeals in its opinion affirming this court's order of August 1982. The statement in the panel's opinion which comes closest to discussing "burden of proof" is the following remark concern-

ing the kind of evidence that is required for a court to decide a motion of this sort:

> Should a dispute of this nature recur, we think it will normally be helpful if those who seek a court order for additional funding, *and those who oppose such an order,* supply the District Court with considerable detail reflecting the proposed expenditures in the absence of the additional funds claimed to be needed. Faced with such presentations, the District Court may find it useful to enlist the aid of a neutral auditor, experienced in school budgeting, to assist in analysis of the figures presented.

712 F.2d at 814 (emphasis added). It is clear that evidentiary burdens are imposed upon both the Board and the City.

In a typical lawsuit, the plaintiff has the burden of producing evidence sufficient to state a *prima facie* case for the claim it attempts to assert. This is sometimes referred to as the burden of production. Additionally, a plaintiff has the burden of persuasion. Normally, this burden is borne only when the plaintiff's evidence persuades the factfinder, by a preponderance of the evidence, that the plaintiff has proven the case it has stated. When a plaintiff fails even to state its case, the case can be dismissed summarily, without the defendant being required to submit any proof.

This case, especially in its present posture, is not a typical lawsuit. Both of the principal antagonists on these motions are defendants. Both the Board and the City were found to have intentionally maintained a segregated school system. *See, Arthur v. Nyquist,* 415 F.Supp. 904 (W.D. N.Y.1976), *aff'd in relevant part,* 573 F.2d 134 (2d Cir.), *cert. denied sub nom. Manch v. Arthur,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978). Subsequently, both of these defendants were obligated to remedy their prior unconstitutional acts. The defendant-codefendant relationship between the Board and the City, with the obligation to desegregate the schools imposed upon both, supports the view that evidentiary

burdens should be imposed upon the City as well as the Board.

The Court of Appeals and Magistrate Maxwell both have noted that Buffalo is a "dependent" school district. As such, it has no taxing power and is completely dependent upon the City for funding. *See*, 712 F.2d at 811; Magistrate's Report at ——. The normal budgetary process consists of the Board devising programs, determining the cost of implementing them, and then asking the City for the funds deemed necessary to operate the schools. The City and the Board then negotiate and agree upon a final figure. The City has the final word on how much money it will appropriate for education, but it has no power to dictate how the money will be spent. Thus, some conflict between the Board and the City is inevitable, even in the absence of complications inherent in a school desegregation program.

The relationship between the Board and the City and their status as codefendants make it difficult to apply burden of proof rules in the ordinary fashion. The task was made even more difficult by what Magistrate Maxwell found to be the Board's woefully inadequate management of budget information. Magistrate Maxwell also found that the Board's habits of transferring funds from one budget line to another and encumbering large amounts of money towards the end of a fiscal year raised suspicions about the Board's candor. *See* Magistrate's Report at 819–826. My own review of the evidence has brought me to the same conclusions. I would only add that upon reviewing the record, I do not believe that the Board's budgetary misfeasance is a deliberate attempt to undermine the City's attempts to review the budget. Nor do I find that the Board has invoked the aid of the court for funds it does not actually believe were necessary to implement the desegregation program.

Magistrate Maxwell also repeated a statement I made three years ago (547 F.Supp. at 478) concerning the City's lack of knowledge about the school budget. The City's task of learning the process is made more difficult by the Board's out-of-date reporting and poor management. However, I agree with Magistrate Maxwell's conclusion that the City's continued lack of knowledge is inexcusable. *See*, Magistrate's Report at 828–829 and n. 24. In my order resolving the 1982–83 dispute, I noted that the Mayor's Board of Education Review Committee had not performed its function of providing information to the Mayor. In fact, the Committee apparently has not even met since the summer of 1982. This state of affairs has persisted to the present day. The Mayor's efforts at understanding the requirements of the Board and the desegregation program are inadequate and must be upgraded.

Burden of proof principles can only be applied with the aforementioned background in mind. My review of the record leads me to the conclusion that Magistrate Maxwell applied appropriate burden of proof principles to the motions he was asked to resolve. The Board's burden was to produce substantial evidence showing that the additional funds it requested were necessary to continue the desegregation effort, as distinguished from funds which would enhance that effort only remotely or not at all. Ultimately, the Board also has the burden to persuade the court that extra funding is necessary. Once the Board sustained its burden of production, the City could not rest and obtain a summary denial of the motions. The City's burden was to produce substantial evidence challenging the Board's case so that the court could, if proper, reach a reasoned conclusion in the City's favor.

The evidence before Magistrate Maxwell brought him to the conclusion that the Board had sustained the burden of stating its case for increased funding. My review of the record leads me to the same conclusion. However, I also share the Magistrate's view (*see*, Report at 828) that the Board's success at sustaining its burden was far from overwhelming. The analysis of William D. Mahaney, the court-appointed expert, was of considerable assistance to

the Board in its effort to state its case. The Mahaney reports and the agreement reached between the Board, the plaintiffs, and the Common Council concerning 1984–85 are the major factors distinguishing the case made by the Board during these proceedings from the case it presented during the hearing before me in 1982.

The Mahaney reports, the testimony of Associate Superintendent Joseph Murray, and the agreement among all parties except the Mayor concerning the 1984–85 school year constitute a consistent and persuasive basis for the conclusions reached by Magistrate Maxwell. Accordingly, I accept and adopt the Magistrate's conclusions.

The City notes that the Board failed to provide it with a line-by-line hypothetical budget showing how the Board would spend the amount of money approved by the City. The Magistrate's report (pp. 826–828) explains the Board's unhelpful manner of explaining how it would spend a lesser amount of funds. The report also explains that the Board's record-keeping is so inadequate that providing more useful and complete detail to the City is not readily possible. This is a deficiency which cannot persist and which the court will not tolerate if the Board seeks judicial intervention in any subsequent year.

However, for the present dispute, I do not think it is appropriate to deny the requests for funds because of the Board's shortcomings on this point. The Court of Appeals stated that both the Board and the City must supply the court with considerable detail. 712 F.2d at 814. The Board's deficient showing should mean that a court would accept a somewhat less detailed showing by the City in rebuttal. Here, however, the Magistrate found that the City made virtually no showing at all. The Magistrate also found that the City's failure in this regard was not entirely attributable to the Board's deficiencies. Inexcusable unfamiliarity with the budget process and the desegregation program contributed greatly to the City's failure of proof. I find no basis in the record to reach a con-

clusion different from that reached by Magistrate Maxwell.

### IV.

On factual issues, a district court must accept the findings of a special master unless the findings are clearly erroneous. Fed.R.Civ.P. 53(e)(2). I have reviewed the record on these motions, and I find no basis for rejecting any of Magistrate Maxwell's findings of fact. I have also considered the legal arguments presented by counsel for the Mayor, particularly those concerning burden of proof. I find no legal error in the Magistrate's report. Accordingly, the Magistrate's Report and Recommendation is approved and adopted by the court without modification.

The court's approval of the Magistrate's report specifically incorporates the recommendations offered by the Magistrate regarding the Board's budgetary processes and the City's efforts to become informed with the requirements of the schools and the desegregation program. *See,* Report at 838–842. The City is perhaps not obligated to familiarize itself with the Board's procedures under ordinary circumstances. But, these are not ordinary circumstances. The City's increased involvement is essential to avoid further disagreements resulting in petitions to the court. It is also essential in aiding the court if it is called upon to decide another motion of this sort.

### V.

In addition to announcing the court's approval of the Magistrate's report, today's order shall require the City (including the Mayor and the Common Council) and the Board to demonstrate to the court what actions will be taken in order to improve their respective performances regarding the budget problem. The court notes that shortly after the Magistrate's report was filed, the Board announced that it was going to undertake a program to update its budgetary and accounting equipment and procedures. The orderly funding of the schools is essential to carry out the letter

and the spirit of the desegregation program. Therefore, it is essential that the court and the other parties be informed of the process which the Board is designing to carry out this important function.

On or before October 15, 1985, the Board is directed to submit a statement to the court setting forth its proposal in regard to this difficult and complicated problem. A meeting will then be held in my chambers on November 1, 1985, at 1:30 p.m. with counsel for the Board, the Mayor, and the Common Council. Attorneys for the plaintiffs and the intervenors are encouraged to attend; however, their presence is not required.

If it is the intention of the Board to put into place a permanent plan to attend to the deficiencies described in the Magistrate's report about the budgetary system, immediate notice should be given to the court so that an earlier meeting may be held before the plan is formally adopted.

Finally, I note that the Board has stated its intention to ask this court to terminate this lawsuit. The Board means to make this application "as soon as possible." *See,* Court Exhibit K to these proceedings, dated February 19, 1985. As a codefendant in this lawsuit, the City would, perhaps, be inclined to join the Board in this endeavor.

Ending the court's involvement in this lawsuit has long been an objective of the court. I have stated this objective before. *See, e.g.,* 547 F.Supp. at 484 n. 17. ("It is obvious that the limited role of the court ought to and must come to an end.") The present status of the school funding issue may present an opportunity for the Board and the City to explore this path together.

However, I must note that termination is a difficult process which requires careful planning and preparation, as well as thorough knowledge of the legal principles that must be applied. A recent unsuccessful attempt at terminating a school desegregation case was made in Denver. *See, Keyes v. School District No. 1, Denver, Colorado,* 609 F.Supp. 1491 (D.Colorado 1985). If a unitary system is found to exist in Buffalo, this court's involvement must end. If and when the defendants in this case, including the Board of Education, believe that the facts and law entitle them to an order terminating this lawsuit, a careful, considered, and thorough presentation to the court should be considered.

### Conclusion

The report of Magistrate Maxwell, acting as special master pursuant to Fed.R.Civ.P. 53 and 28 U.S.C. § 636(b)(2), is adopted and approved without modification. Counsel for the Board, the Mayor, and the Common Council shall meet with the court in chambers on November 1, 1985, at 1:30 p.m.

A copy of Magistrate Maxwell's Report and Recommendation is set forth in its entirety as an appendix to this order.

So ordered.

## APPENDIX
### REPORT AND RECOMMENDATION OF HONORABLE EDMUND F. MAXWELL UNITED STATES MAGISTRATE

### TABLE OF CONTENTS

Page

PREFACE .................................................. 812
I. Background of the Buffalo Desegregation Case ................ 812
   A. Earlier Proceedings ...................................... 812
   B. Hearings Before the Magistrate ......................... 814
II. Preliminary Issues ......................................... 814
   A. Relationship of the Board and City ...................... 814
      1. Board's Fiscal Relationship to the City ................ 814

APPENDIX—Continued                                                      Page
   2. Affordability of Court's Desegregation Orders ......... 815
   3. The City's Budget Reduction Approaches .............. 816
  B. Identification of Desegregation Related Costs  ............ 816
  C. Transfers, Encumbrances and Financial Reporting  ........ 819
   1. Transfers .......................................... 819
   2. Encumbrances ...................................... 823
   3. Financial Reporting ................................ 825
 III. Burden of Proof  ........................................ 826
 IV. Alternative Approaches  ................................... 829
  A. The Desmond Committee Report  ........................ 829
  B. The Assumed Model  ................................... 830
 V. The Budget Requests  .................................... 831
  A. The 1984–85 Budget  .................................. 831
  B. The 1983–84 Budget  .................................. 836
 VI. Comments  .............................................. 838
 RECOMMENDATION  ........................................ 842

## PREFACE

On June 16, 1983, the defendant Buffalo Board of Education (Board) filed a motion requesting that the defendants Mayor and Common Council of the City of Buffalo (City)[1] be directed to provide to the Board $172,335,379 ($172.3M)[2] of Operation and Maintenance (O & M) funds for the 1983–84 school year. The City had previously appropriated $158,840,503 ($158.8M) for that year.

One year later, on June 15, 1984, the Board filed a similar motion requesting that the Court direct the City to provide $192,853,446 ($192.8M)[3] for the 1984–85 school year, approximately $16M more than the $176,145,147 ($176.1M) which the City had previously appropriated.

By order of the Hon. John T. Curtin dated July 25, 1984, these matters were referred to me to hold evidentiary hearings and prepare a report and recommendation as provided in 28 U.S.C. § 636(b)(2). The following constitutes my findings of fact, conclusions of law, and recommendations.

## I. Background of the Buffalo Desegregation Case.

### A. Earlier Proceedings.

In April 1976 the Board and City were found to have engaged in deliberate and unconstitutional segregation of the Buffalo Public School System (BPSS). *Arthur v. Nyquist*, 415 F.Supp. 904 (W.D.N.Y.1976) *aff'd in part, rev'd in part, remanded in part*, 573 F.2d 134 (2nd Cir.1978). As a result of the many hearings which were subsequently held, a final plan for desegregation of the BPSS, known as Phase IIIx, was put into effect in September 1981.[4]

---

1. The Mayor and the Common Council of the City of Buffalo are named defendants in this suit. They were represented by a single counsel throughout these proceedings until the last few days of the hearings before me. At that time, the Common Council retained separate counsel and the city's original counsel remained as counsel for the Mayor. For purposes of clarity throughout this report, when the Mayor and the Common Council are referred to jointly, the term "City" will be used. When referred to separately, the terms "Mayor" and "Council" will be used. In all cases, the term "Board" will refer to the actions of both the Superintendant of the Board of Education and the members of the elected board itself.

2. Unless the exact amount is required for clarity, monetary amounts will be rounded off as follows:

 a.  $192,655,000 = $192.6M.
 b.    $192,655 = $192.6K.

3. After the hearings before me had begun, the Board lowered its request to $189.2M and the City increased its appropriation to $179.7M.

4. For a more detailed history of the implementation of this plan and of the matters leading up to this hearing, *see, Arthur v. Nyquist*, 547 F.Supp. 468 (W.D.N.Y.1982), *aff'd*, 712 F.2d 809 (2nd Cir.1983).

Over the next four school years,[5] the Board and City differed as to the amount necessary to fund the Board's O & M budget. As the figures in Table 1 illustrate, the magnitude of the difference between the Board's initial request and the City's initial appropriation has remained substantial.

| Table 1. City's Appropriation vs. Board's Budget Request (O&M) | | | | |
|---|---|---|---|---|
| School Year | Board's Initial Request | City's Initial Approp. | City's Final Approp. | Actual Expenditures |
| 81–82 | $156.8M | $138.1M | $141.2M | $139.3M |
| 82–83 | $160.2M | $149.1M | $156.5M | $155.9M |
| 83–84 | $172.3M | $158.8M | ---------- (1) | $168.5M |
| 84–85 | $189.2M | $179.7M | ---------- (1) | ----------(2) |

(1) City's final appropriation is dependent on the determination of the pending motion.

(2) Board's actual expenditures will not be known until after June 30, 1985.

Source—Ct. Expert's Special Report #1:
Court Exhibit B.

For the year 1981–82 the Board filed a motion similar to the two instant motions requesting that the Court direct the City to increase its initial appropriation. Eventually, the Board and City settled on an appropriation of $141.2M in O & M funds.

For the year 1982–83 the Board again sought Court intervention to increase its appropriation from the City. This time the parties could not agree on a compromise figure, so after conducting hearings, Judge Curtin ordered the City to appropriate an additional $7.4M which brought the total appropriation to $156.5M. *Arthur v. Nyquist*, 547 F.Supp. 468 (W.D.N.Y.1982).

For the year 1983–84, the by now familiar routine began again. This time, however, the motion was not resolved before the school year began, and the Board operated through the year on a spending plan which called for expenditures in the amount of its $172.3M request. In May 1984, one month before the end of the Board's 1983–84 fiscal year, the Board had exhausted the City's initial $158.8M appropriation and sought relief from the Court to permit it to complete the last month of school. As an interim solution, the parties agreed, and the Court ordered, that an additional amount of $8.7M be made available to the Board for the balance of that fiscal year. That order specifically did not determine the rights of the parties with respect to the original 1983–84 motion, which is presently before me.

Finally, the cycle repeated itself for the 1984–85 school year, with minor variations. The Board's initial budget request was for $192.8M, and the City's initial appropriation was $176.1M. After the hearings before me had begun, in August 1984 the parties agreed to a compromise measure in which the Board reduced its request to $189.2M and the City raised its initial appropriation to $179.7M. The Board advised, however, that it intended to spend at the rate of its request of $189.2M rather than at the rate of the appropriation. Short term fears that this practice would place the Board in a similar cash-short position at the end of 1984–85, as it faced the previous year, were expressed by some parties. However, it appears that the Board has established its accounting records such that the shortfall, if it appears, will occur after the close of

**5.** School years and school fiscal years in the   BPSS run from July 1 to June 30.

the fiscal year, thus permitting the completion of the '84–85 school year.

### B. Hearings Before the Magistrate.

Formal hearings began before me in August 1984. During these early sessions, the lack of information in a format which could be easily used by the parties became apparent. Despite suggestions from the Second Circuit, no party indicated any intention of calling its own expert witness to assist in interpreting the information. Accordingly, I appointed Mr. William Mahaney, a certified public accountant with broad experience in the area of public school financing, as an expert under Rule 706 of the Federal Rules of Evidence. Mr. Mahaney and his staff then began the lengthy process of evaluating the information needs of the parties and the court, and gathering the necessary information so it could be presented in a useful format. Through the autumn there were frequent recesses to accommodate settlement discussions and to await receipt of necessary information from Mr. Mahaney.

By mid-October, settlement discussions had essentially stalemated. Thereafter, a more rigid hearing schedule was established, and ultimately testimony was completed on February 19, 1985, after 50 days of hearings.

At the hearings, the Board presented its witnesses in support of its budget request, and the bulk of the testimony came from cross-examination of these witnesses. The City offered some evidence in support of its claim that the amount it had appropriated was sufficient. In addition, various persons appeared to testify on related matters such as the teachers' bargaining agreements and handicapped education. Finally, the court-appointed expert, Mr. Mahaney, testified at the conclusion of the hearing as to the substance of his findings.

### II. Preliminary Issues.

#### A. Relationship of the Board and City.

Prior to a detailed analysis of the evidence in this case, I believe some observations are necessary to put the complexity of this issue in perspective.

#### 1. Board's Fiscal Relationship to the City.

The Board of Education is a dependent school board under New York State law. As such, it has no independent taxing authority; it cannot generate its own revenues. The Board is completely dependent on the City for its funding.

From the City's perspective, the public school system administered by the Board requires a major portion of the City's revenues. While the Board is treated as any other department of the City for funding purposes, the Board is unique in its independence from any fiscal control or oversight by the City once the funds are appropriated. State law requires the City to appropriate funds for the Board, but also gives the Board exclusive control over the expenditure of those funds. This requirement, to appropriate funds over which it has no expenditure control, is a sore point with the City and plays a major role in these annual funding disputes. The City, which has taken some pride over the years in restraining the growth of various city departments, has been frustrated in its attempts to impose its own fiscal restraints on the Board.

On the other hand, the Board is in a fiscal position unique among the various city agencies. It is operating under a Federal court order to maintain a desegregated school system and it is under continuing and increasingly costly mandates relative to handicapped and bilingual education. The question of whether the Court orders and State mandates are used by the Board as a lever to obtain additional funding in excess of the amounts necessary to comply with these various requirements is an issue underlying the annual failure of the City and Board to reach an agreement on an appropriate School Board budget.

The Board's O & M budget has increased over the years to the point where it is now larger than all other City departments combined, comprising over half of the City's

annual budget. The Board is quick to make the point that of its total budget request for '84–85 of $189M, the amount contributed directly by the City from real property tax revenues is only $45M, and that while Board requirements have increased because of desegregation, the increase in direct City funding has not been proportionately as great because of increases in State and Federal aid.

The Board's budget also has an impact aside from the allocation of resources among various City departments. Particularly in the bond market, the ability of the City to obtain favorable interest rates is directly dependent upon outside analysts' assessment of the fiscal management of the City as a whole. Since the bond market does not distinguish the Board from the City for purposes of its evaluation, the City must accept the impact of the Board on the City budget without being able to directly control it. This, too, has contributed to the friction between the City fathers and the leadership of the Board.

Despite the serious impact the Board's budget has on the City's financial health, the Mayor and Common Council devote relatively little time to reviewing the Board's annual budget request. The Board Superintendent develops the next year's budget request between October and January of the current fiscal year. The budget proposal is adopted by the Board members in late January and presented to the Mayor in early February. Subsequently, the Mayor holds a series of hearings in which his staff and members of the public can question the Board's proposed budget. The Mayor then determines the amount of money which he will propose to the Common Council as the Board's budget, and makes his presentation of the entire City budget by May 1st. The Council holds public hearings on the entire budget, including the Board's portion, and thereafter acts on the budget, making additions or reductions within its authority under the City charter.

This budgeting process, applied to the Board, results in the exchange of very little information between the Board and City.

In other City departments, such as the Streets Department, the Mayor, as the executive in overall charge of their operation, has had day-to-day contact throughout the year with the managers of those departments and has had an opportunity to keep himself apprised of their needs. However, because of the Board's independence from City supervision, no similar communication has gone on during the year. The possibilities for differences of opinion over appropriate funding levels caused by this lack of communication cannot be overstated.

### 2. Affordability of the Court's Desegregation Orders.

During the hearings, attempts were made to introduce evidence as to the capability of the City to fund the Board's request, and the impact on the City of any Court orders directing expenditures of funds in excess of those already appropriated. The City sought to prove that its short term borrowing ability might be affected or that its constitutional limits of taxation might be exceeded if it appropriated the amount requested by the Board. The Board claimed that the City in fact has been withholding some of the State and Federal aid intended for the BPSS by failing to pass it on to the Board. The Board claimed that if all the State and Federal aid allocated for the schools was in fact applied to the school needs, there would be no impact on City property taxes or the City's financial standing. For the limited purposes of these hearings, however, the issue of affordability is not before me. The Board and City, as co-defendants in this suit, are required to insure that sufficient funds are available to maintain the desegregation orders of the Court. Surely, the proper allocation of earmarked school aid from State or Federal sources is a part of that responsibility. But the limited purpose of my participation in this case is to recommend to the Court a sufficient budget amount for the years '83–84 and '84–85, and such a recommendation is independent of the affordability of the amount and the proper distribution of the State and Federal aid intended for the schools.

### 3. The City's Budget Reduction Approaches.

The City at times appeared to be arguing that the Board could reduce its funding needs by eliminating certain programs, such as the pre-kindergarten programs. At other times, the City argued that the Board could reduce its funding needs by operating the existing programs more efficiently. These arguments were not clearly focused by the City, but deserve to be distinguished.

The issue of efficiency in operating the existing school system was a major focus in the hearings. The City properly tried to identify areas in which the Board could save money through increased efficiency without impacting the overall desegregation plan.

However, the City's argument that the Board should consider elimination of certain programs involved in the desegregation plan is inappropriate in this proceeding. The Board and the City were found equally guilty of the illegal segregation of the BPSS. As a remedy, the Board and the City agreed to the existing voluntary desegregation plan. The key to the success of the existing plan is its voluntary nature. 547 F.Supp. at 470. This voluntary plan is the preferred method of accomplishing the desegregation requirements. *Id.* at 472. The City in fact did not dispute that the quality of education within the BPSS is directly related to the success of this voluntary desegregation plan. *Id.* at 472 n. 5. As noted by Judge Curtin, the City and Board are committed to a continuation of the existing voluntary system by the history of this litigation and past Court orders. *Id.* at 477. Having committed to the voluntary plan, the City must accept the fact that a voluntary plan is inevitably a more expensive method of desegregation. 712 F.2d 809, 811. An alternative desegregation plan may have proven less expensive, but there is no way of knowing if that is so, and in any event it is not a feasible alternative at this time. 547 F.Supp. at 472, n. 4.

If the City wants to pursue arguments that major portions of the voluntary desegregation plan be eliminated, the appropriate vehicle is by a separate proceeding in front of Judge Curtin. The Board and City, in the meantime, have an affirmative duty to carry out the desegregation plan as it now stands, notwithstanding that it may well be more expensive. The City's present suggestions before me to radically alter the existing plan must be rejected.

### B. Identification of Desegregation Related Costs.

A major bone of contention throughout these hearings has been the question of how to distinguish between increased costs in support of the desegregation program, and increased costs whose only purpose was to improve the overall quality of the education system in the BPSS.

In its decision, the Second Circuit noted that it was directly confronted with this problem when plaintiff's counsel on appeal, Mr. Atkins from the NAACP, stated that he could not support Judge Curtin's decision because the Board had failed to provide sufficient detail to distinguish the desegregation related costs from other costs. Mr. Atkins' concern, apparently on a nationwide basis, was that boards of education were using court desegregation orders to pursue many of the unmet educational needs of the system, not merely those related to desegregation, and in so doing were causing the proponents of desegregation to endure the wrath of the community for the increased costs of education. 712 F.2d at 813.

The Second Circuit dealt at length with the limits to a court's power in ordering expenditures for desegregation. The Circuit suggested the issue involved determining whether or not the additional money was ordered by a district court only to the extent necessary to implement desegregation needs. In that analysis, a program necessary for desegregation would not be excluded merely because it had the additional benefit of improving the overall school system. However, if the proposed

expenditure would affect the school system in a way only remotely connected to the desegregation plan, the court could not order the additional funds. Striking this balance between remote and direct connection to the desegregation efforts required deference to the judgment of the school officials. 712 F.2d at 813. In his decision, Judge Curtin framed the issue similarly, observing that if the only impact of a failure to provide additional funds to the Board was to have a deleterious effect on the overall school system, without negatively impacting the desegregation program, then the Court was without power to order the City to pay the additional funds. 547 F.Supp. at 473.

On January 20, 1984, in response to the City's motion to compel the Board to answer certain interrogatories in this action concerning what the City called "desegregation items" in the 1983–84 budget request, Judge Curtin said:

> There is some difficulty with the City's use of the term "desegregation item." In a desegregation plan which relies primarily upon voluntary pupil assignments, it is difficult to define which budget items are "desegregation items" and which are not.
>
> However, it is possible that various items are more, or less, directly related to the Board's ability to implement the court's school desegregation orders. It may also be that some budget items are only remotely related to achieving the goal of a unitary system, and still others that are not at all related to that goal. This court must avoid imposing an order requiring the city to appropriate money for such items. *Id.* at 813.
>
> The Board apparently believes that every budget item is necessary to implement the court's desegregation orders. If that is the case, then the Board's response to the City's interrogatories ... might be a line-by-line spending plan in accordance

with the limits imposed by the City's $158.8 million appropriation. If the Board determines that some items are unrelated or only remotely related to carrying out the court's desegregation orders, then its response would reflect that determination.

J. Curtin order 1/20/84 pp. 4–5. In response to this order, Superintendent Reville submitted an affidavit detailing a list of cuts he would make to bring the Board's budget in line with the City's appropriation. This document was similar in presentation to City Exhibit E relating to the 1984–85 budget request which was presented at the hearings before me. The most significant part of that affidavit was the assumption that Mr. Reville stated was implicit before any of the cuts he proposed were made. His stated assumption was that prior to any cut being made, the Court would have to give the BPSS permission to discontinue implementation of the desegregation plan until sufficient funds are provided to restore all programs which have been operated as a part of the systemwide desegregation effort. Mr. Reville clearly took the ominous position that *any* cut he made in the Board's '83–84 budget of $172.3M or the next year's budget of $192.8M would have a direct and deleterious impact on the desegregation plan.

While at first glance the list of cuts provided by Mr. Reville might be interpreted as the Board's best judgment as to which items could be reduced in cost without adversely affecting the desegregation plan, that is clearly not the implication the Board intends to convey. Rather, the Board maintains its position that because the success of the voluntary desegregation plan depends on the attractiveness of the school system, the entire operating budget of the Board is in effect directly related to the desegregation orders of the court.[6]

---

6. While Mr. Reville's testimony as to these exhibits is somewhat lacking in precision, it is evidently his position that the cuts are not set out in the documents in any order of remote-

ness or directness to desegregation. (Tr. 8–140. Transcript references are to the volume and page of the transcript of these hearings.)

The Board also took this position in the meetings with the Desmond Committee.[7] In his order of April 10, 1984 impapaneling the Committee, Judge Curtin directed that "[t]he parties shall aid the committee ... by identifying those budget items which, in their view, are most closely and most distantly related to the goal of desegregating the BPSS." The Committee thereupon asked the Board to provide specifics as to non-personnel items which: a.) were required to implement desegregation; b.) were required by Federal or State mandates; c.) would serve to maintain the quality of education; d.) would serve to enhance the quality of education; or e.) were necessary for other reasons. The Committee felt that the latter two categories would not come within the court's purview. The Board in its response claimed all of the items in its budget request were in the first three categories. (See City Exhibit J; Tr. 8–153.)

The Second Circuit's suggested deference to the judgment of the school officials on what is remotely and what is directly connected to desegregation becomes difficult to apply under these circumstances. The City's counterargument—that even without a desegregation plan the Board would still incur a host of basic expenses in operating the schools—sounds simple in the abstract. However, if determination of the additional costs associated with desegregation is dependent on the judgment of the school officials, and those officials take the position that such differentiation is impossible in a complex integrated school system, then an obvious dilemma is created.

In an attempt to resolve this problem, I specifically sought argument from counsel in their post-hearing briefs addressing the issue of what standards a court should use in making the determination between items directly and remotely related to the costs of desegregation, or, alternatively, whether the Board's position that making such distinction is impossible ought to be accepted. In a joint preliminary statement, all parties except the Mayor claimed that the Board's position was correct—the costs could not be fairly differentiated. The Mayor made the point that at least some City services, such as school crossing guards and fire protection, not funded through the Board, were equally as important to desegregation as some of the items in the Board's budget. However, the Mayor failed to suggest any way in which the distinction between items directly and remotely connected to desegregation could be determined, and failed to give any examples of any areas so remotely related.[8] Rather, he argued the Board had an affirmative duty to make available some method of distinguishing, and that it had failed to do so.

Faced with this inflexibility in positions, I am compelled to make a determination on this issue without benefit of reasoned argument from the many counsel who participated in these hearings. On the one hand, common sense indicates that the Board would require a budget much in excess of $100M regardless of any court desegregation orders. On the other hand, the desegregation of the BPSS has involved such a sweeping change in the system that, in many ways, every facet of the Board's operation is in support of the desegregation program. Undeniably there are expenditures in the BPSS which have the effect of improving the overall quality of education. To the extent those expenditures contribute to the success of the desegregation plan, they are proper improvements. However, I am convinced that there are some areas in which lesser amounts than those originally requested could be spent without having a deleterious effect on the desegregation plan.[9]

---

7. *See,* Section IV.A, *infra.*

8. At one point during the hearing, counsel for the Mayor took the extreme position that if a particular class consisted only of caucasian students, its teaching position was not related to the desegregation plan and this Court could not require that it be funded. Counsel did not pursue this argument in his brief, and in any event I find the argument completely unrealistic.

9. Evidently, the Board officials have finally come to such a conclusion also, as evidenced by their stipulation that the System can operate on $185M.

The Board's position hinges on the presumption that *any* negative impact on the school system as a whole has a negative impact on the desegregation plan. This argument places the City in a quandry. In theory, a deleterious impact on the school system as a whole could affect majority and minority children equally, resulting in a non-discriminatory negative impact. The Court has no power to prevent a budget cut if the only effect of the cut is to have a deleterious impact on the quality of the school system. 547 F.Supp. at 473. In this case the City has been thwarted from showing such an effect by the Board's adamant linking of the overall quality of education to the success of the desegregation plan. The City has been unable, from examination of the Board's personnel, to make such a showing, and has not taken any affirmative alternative steps of its own to do so.

In my judgment, the City failed to adequately challenge the Board's position on this issue. Despite the years this lawsuit has been in existence, the City has never sought an outside expert to help it challenge the Board's position[10], nor has the City suggested any method by which the Court could make that determination on its own. The judgment of the Board officials is that the costs cannot be effectively differentiated, and those officials are the only persons with any expertise on the subject to have presented evidence in this hearing. For that reason, on the basis of the present record, I am compelled to adopt the position of the Board that all of the programs for which the Board seeks funding materially aid the success of the overall desegregation effort.[11] This shifts the primary issue for resolution in these hearings to the question of whether or not the amount of money requested for each of the various items is in fact necessary.

### C. Transfers, Encumbrances, and Financial Reporting.

Much of the confusion during the hearings and settlement conferences arose in part because of the unfamiliarity of the participants with the Board's accounting system, and in part because of the Board's delinquent reports of their financial situation. A brief summary of some of the major points is appropriate here.

### 1. Transfers.

In the past, after the Common Council had made its appropriation, the Board developed an operating budget based on the appropriation. In the past two years, because of the disputes, the Board has instead prepared a "spending plan" for each year. In theory, the Board's operating budget or spending plan reflects the way the Board intends to spend the money appropriated by the City. It is not obligated to spend the money as it originally indicated in its budget request, but historically the Board's actual spending plan has generally followed its budget request for that year. At the beginning of the fiscal year, each line item is given an initial appropriation which reflects the Board's best estimate of the amount of money the programs or services covered by that line will require, and the total of those lines normally equals the City's appropriation.[12] During

10. Judge Curtin in his order of April 10, 1984, at page 6, "strongly advised" both parties to employ experts.

11. Based on the evidence presented, I am not satisfied that the Adult Education Program is so closely related to desegregation as to be protected. However, I understand that its cost is fully reimbursed by the State and it is of great value to the taxpayers. The City has not suggested that it be eliminated from the budget and I thus will not consider it.

12. In the two years presently in dispute, the line item amounts in the spending plan were in the same amounts as those lines in the budget request with the sole exception of Line 9020–800, Teachers Pension. In '83–84 the requested amount of $17.8M in this line was reduced to $4.3M in the spending plan to account for the $13.5M in dispute. In '84–85 the requested $18.9M was reduced to $5.7M to bring the spending plan within the original City appropriation of $176.1M. The Board's liability in these lines is not reduced however, and the full amounts due to the State retirement system are deducted from the following year's State aid.

the year, circumstances occur which require the expenditure of more funds from one line than originally allocated by the Board. In those circumstances, transfers from one line to another are recommended by the Superintendent's staff and entered in the Board's records.

If the transfer is between two lines within the same general account, the Board's approval is not necessary, but the Board is notified of the transfer at the next Board meeting. In principle, there is nothing wrong with the concept of transfers because reallocation of resources may be necessary in order to accommodate unforeseen contingencies which may arise. However, problems do arise in the way those transfers are recorded and reported.

There are instances where the Board would consistently, over a period of years, indicate in their budget request that for a particular line item a certain amount of money was needed, yet would consistently transfer out some portion of that money to different accounts. Conversely, there were also instances where the Board would consistently spend more in a particular line than it had requested, yet not adjust its future year's request upward to reflect the actual costs. This gives the impression of poor management and poor fiscal controls to the City which believes that the Board should modify its annual requests to accurately reflect the amount of money actually spent in a particular line. It also makes it difficult for the City or a reviewing court to determine whether the amount sought is actually needed to comply with the desegregation plan.

For example, pages 1 and 2 of Court Exhibit B [13], which is Mr. Mahaney's Special Report #1, show the history of expenditures for a number of line items, including lines 1010–501 and 1010–475, as excerpted below in Table 2.A. and B.[14] In the case of 1010–501, as shown in Table 2.A., there is a history of overfunding of that line. As a result of this point being made during the hearings, the Board's 1985–86 budget request (Plaintiff's Exhibit 21) shows the Board has adjusted their request to reflect actual use, for the first time in at least five years.

Conversely, in 1010–475, as shown in Table 2.B., there is a history of underfunding that line. This underfunding continued from 1981–82 through 1984–85 until the Board, evidently reacting to criticism at these hearings, adjusted its budgeting procedure for 1985–86 to reflect the actual costs.

13. Court Exs. A through E were revised during the hearings. All references herein relate to the revised exhibits.

14. Throughout this report, the prefix "A00" which precedes each account under the Board's numbering system is omitted from the particular line item.

| Table 2.A. Account 1010–501 Office Supply Expenses | | | |
|---|---|---|---|
| Year | Budget Request | Appropriated Budget | Actual Expenditure |
| 1981–82 | $7000 | $7000 | $3249 |
| 1982–83 | $7000 | $7000 | $3917 |
| 1983–84 | $7000 | $7000 | $5227 |
| 1984–85 | $7000 | $7000 (1) | --- |
| 1985–86 | $5500 (2) | | |

(1) Derived from the Board's September 1984 Monthly Statement, Plaintiff's Exhibit #23.

(2) Derived from the Board's 1985–86 Budget Request, Plaintiff's Exhibit #21.

Source—Ct. Expert's Special Report #1:
Court Exhibit B.

| Table 2.B. Account 1010–475 Board Members Travel | | | |
|---|---|---|---|
| Year | Budget Request | Appropriated Budget | Actual Expenditure |
| 1981–82 | $8000 | $8000 | $18395 |
| 1982–83 | $8000 | $8000 | $18728 |
| 1983–84 | $8000 | $8000 | $26878 |
| 1984–85 | $8000 | $8000 (1) | |
| 1985–86 | $28000 (2) | | |

(1) Derived from the Board's September 1984 Monthly Statement, Plaintiff's Exhibit #23.

(2) Derived from the Board's 1985–86 Budget Request, Plaintiff's Exhibit #21.

Source—Ct. Expert's Special Report #1:
Court Exhibit B.

The Board continued to assert that there was nothing illegal or otherwise improper in their budgeting procedure, and I do not disagree. Some transfers, specifically the end of the year transfers between accounts to balance out the over and under expenditures, are a normal part of accounting. However, from the standpoint of justifying its budget needs to the City and to the Court the system is particularly confusing and raises doubts about the Board's ability to efficiently manage the money entrusted to it by the City.[15] The questions most frequently asked in the hearings were: 1) where was the money which was transferred out of a particular line ultimately spent; 2) what was the source of the money that was transferred into a particular line; and 3) what criteria had the Board used in determining that some funds would

15. During the fiscal year '83–84, there were total gross transfers of $13.1M, of which $11.5M was transferred on or after June 30, 1984. Court Ex. A–83/84, p. 22i.

not be used for a particular item and could be reallocated.[16]

In order to help the parties answer those questions, Mr. Mahaney prepared in Exhibit B to each of the three Court Exhibits A–81/82 through A–83/84, which are the analyses of the Board's Budget and Expenditure Reports for the years 1981–82, 1982–83, and 1983–84. Exhibit B to each of the three reports assigns a chronological reference number to a particular transfer as recorded in the Board's records. This approach permits partial tracing of the timing and of the amount of transfers.

For example, referring to pages IV and 16 of Court Exhibit A–83/84, the transfers which affected line 1010–501 in the 1983–84 year can be traced. The result is set out in Table 3.

| Table 3. Transfers In and Out of Account 1010–501 Board of Education Office Supply Expense in 1983–84 | | |
|---|---|---|
| Date | Amount of Transfer | Description of Transfer |
| 12/14/83 | $3500 (Out) | Transfer TO line 1010–475, along with $1500 from 1010–498 to make total transfer of $5000 Into 1010–475. |
| 2/26/84 | $2500 (In) | Transferred FROM line 1314–165 as part of reallocation of $14,500 from that line to various lines. |
| 6/30/84 | $773 (Out) | Transferred TO an undetermined line as part of end of year account balancing. |
| Source—Ct. Expert's Special Report #1: Court Exhibit B. | | |

From this relatively simple example, some of the questions and concerns raised in the hearings can be understood. Since the $3500 was transferred from a supplies account into a travel account, to someone outside the Board it could appear that the Board was using this system to avoid defending a large travel budget to the City. The $2500 reallocation from 1314–165 was part of over $39,000 transferred out of that account during the year, with no transfers back into the account. This suggests the possibility that the 1314–165 account might have been intentionally overfunded so that shortages in other accounts could be made up during the year. To a suspicious reviewing or funding body, the Board's methods of handling transfers do not promote confidence in the Board's efficiency.

A related problem was brought up on cross-examination of Mr. Reville with respect to transfers brought before the Board in September 1984 which affected the 1984–85 budget. In particular, City Exhibit PP shows the documents presented to the Board concerning transfers from line 2100–535 into line 2610–541, and a simultaneous transfer from line 2610–541 into 2610–400.[17] Attempts by counsel to obtain explanations as to why the transfer was not made directly from 2100–535 into 2610–400 consumed a lengthy period of testimony and did not yield a definitive answer. The point here, which the Board would be well advised to accommodate, is not that the Board is doing anything improper, but that review of this system by the City or

16. There were suggestions by some counsel that the same criteria could be used to determine the degree to which a line item was related to desegregation, but this approach was not pursued in the briefs.

17. Tr. 31–102 et. seq.

any court is hampered by a combination of the complexity of the system used and the inability of the Board's representatives to clearly articulate explanations when they are requested.

### 2. Encumbrances.

A second term which is important to an understanding of the Board's budgeting process is the encumbrance. As it was explained during the hearings, an encumbrance is a setting aside of an amount of money for obligations in the form of purchase orders or contracts where the goods or services are not going to be delivered and paid for until sometime in the future, but for which funds need to be reserved at the time of the commitment. An encumbrance might encompass only one fiscal year, in which case the good or service is delivered and paid for before the end of the current fiscal year. There will also be situations in which the good or service is not expected to be delivered in the current fiscal year, but for which a contract or other commitment with a vendor or supplier has been made in the current fiscal year.

An example used in the hearings was a contract for school building repairs which were not going to be made until after the end of the fiscal year on June 30, but for which a contract was entered into before June 30. A similar situation would occur when office equipment is ordered in April, but not delivered and invoiced until August. After the work is completed, or the goods are delivered, the encumbrance is released and payment is made of the amount due.

If there is an unencumbered balance in a line account at the end of a fiscal year, that fund balance is either applied to any prior deficit or returned to the City. If the balance is encumbered, it remains under the control of the Board and is in effect added to the next year's appropriation for that line account.

The City has maintained all along that the Board is abusing the encumbrance system by encumbering an excessive amount of money at the end of the fiscal year so that the unencumbered balance is very low. There is also some evidence that a portion of the end of the year encumbrances cover the costs of projects which the Board would like to have performed, but were not planned for in the original budget. The effect of such procedures would be to prevent any fund balance or unencumbered balance from reverting to the City or being applied to prior deficits. A measure of the Board's use of the encumbrance method to carry forward current year funds into the next fiscal year is available from Exhibits A, B, and C of Court Exhibit C which is Mr. Mahaney's Special Report #2. The Board's encumbrance history and the fund balance ultimately returned to the City each year is shown in Table 4, below.

| Table 4. Board of Education Encumbrance History | | |
|---|---|---|
| Year | Outstanding Encumbrances At Year End | Fund Balance At Year End |
| 1981–82 | $2.6M | $21,761 |
| 1982–83 | $0.9M | $17,560 (1) |
| 1983–84 | $2.2M | ($11M) (2) |

(1) Fund balance remaining after $2.1M deficit retirement amount, as required by State law, was deducted.

(2) 1983–84 fund balance subject to change depending on outcome of the present motion.

Source: Internal Exhibits A, B, and C of Court Exhibit C.

Mr. Mahaney indicated that the total amount of encumbrances at the end of the fiscal year, considering the size of the Board's budget, was not excessive. However, Mr. Mahaney testified that it was unusual to have fund balances as small as $17K or $21K considering the size of the budget. He suggested these numbers indicated a practice of using encumbrances to deliberately minimize the size of the fund balance. The issue raised by the City was not so much the size of the outstanding encumbrances, but the fact that many of the encumbrances seemed to have occurred toward the end of the fiscal year in an attempt to use any available funds so that none would revert to the City.[18]

There was testimony from Mr. Clapp that it was the Board's practice and policy to encumber any available funds at the end of the year so as not to end up with a surplus. Mr. Clapp stated that the Board's motivation was not specifically to use up the available surplus so that it would not revert to the City, but rather to take advantage of the surplus funds to meet urgent, otherwise unfunded needs of the Board. This practice of the Board, coupled with the Board's inability to readily identify the purpose of the end of the year encumbrances, prevents the City from considering the propriety of the projects, and contributes significantly to the mistrust between the parties.[19]

18. For example, the outstanding encumbrances between the end of May '84 in the Building Maintenance & Repairs account (1629) and the end of June '84 increased $1.1M in 30 days.

19. A related issue raised rather strenuously by the City but which seems rather insignificant to me is the issue of allocating the outstanding encumbrances between the current and preceding fiscal year. As indicated above, the previous year's outstanding encumbrances are rolled forward into the total appropriation for the current fiscal year. This naturally tends to increase the amount of the total appropriation over the amount actually appropriated for that year. Since much of the analysis in this proceeding has been based on reviewing total appropriations and amounts actually spent in prior years, the City claims this rolling forward is causing a distorted picture. Specifically, the City suggests that for purposes of this hearing the outstanding encumbrances at the end of a fiscal year should be considered part of the total expenses for that fiscal year, and not rolled forward. The City believes that if such an approach is applied to the last four or five years of financial data, the actual expenses of the Board for those years will be lower than is reported in the various exhibits. When questioned on this point, Mr. Mahaney's opinion was that in any given year the change that would occur in the actual expenditures using the City's suggested procedure would amount to $1M or $2M at best. Not only was such a procedure contrary to the accounting procedures specified by the New York State System of Accounts, but more significantly, the amount in question was barely 1% of the Board's overall budget and in Mr. Mahaney's opinion was not of a large enough amount to be a "material" factor in an analysis of the budget.

While I am not unduly concerned with the accounting technicalities of this question, I am concerned with the apparent practice of the Board of encumbering all its unexpended funds at the end of the fiscal year. If the funds have been properly encumbered, as represented by appropriate purchase orders or contracts, there is no problem. Regretably, the Board was unable to produce documentation which would explain the end of the year encumbrances when this issue was raised. If these funds are encumbered merely to prevent the existence of a fund balance at the end of a fiscal year then there is cause for concern that the Board is being less than forthright in its presentation to the City and this Court. The Board may well have a legitimate motivation for this practice. However, when it seeks a court order compelling the City to provide funding, I believe it is incumbent upon the Board to go out of its way to satisfactorily explain the issues which have caused questions to be raised. In this case, the explanation provided by the Board was not satisfactory, and as a result the year-end encumbrances are particularly suspect.

### 3. Financial Reporting.

There were a number of instances during this proceeding when the Board's ability to generate timely and accurate financial reports was questioned. In addition to raising feelings of distrust between the parties, the Board's inability to provide financial reports in a timely fashion suggests the larger problem identified by Mr. Mahaney[20] and the Deloitte Haskins' report[21]—that is, the absence of high quality financial reports indicates that management does not have the tools with which to exercise high quality financial management.

For example, an additional issue dealing with transfers was raised concerning the Board's internal financial management reports. Mr. Mahaney reported to the Court that it was his observation that because the Board handled much of their daily financial work manually, there was a significant delay between the occurrence of a transaction and the time when the transaction would eventually show up on a management report. He suggested that the Board should be running their financial departments on a "real-time" basis using a computerized data processing system.

An illustration of this delay in reporting is provided by City Exhibit 5, a weekly account summary dubbed the "Green Monster" which bore a run date of November 23, 1984, but which did not show transfers which had been made during the year up to that date. Mr. Reville suggested that even if that particular document was not current, a person who had the responsibility for deciding from which line a transfer could be made would be able to determine the amount available in a particular line from looking at the ledger. That may well be true for any particular line item. However, it is hard to imagine how the managers at the Board are able to effectively ascertain their financial status at any given moment if their reports are weeks or months behind in providing them current information. A reviewing body, such as the City, might justifiably conclude that the financial management within the Board was well below any reasonable level of effectiveness.

Another example is shown by the delay in the generation of the June monthly statement for 1983–84. During the hearings before me, various parties requested that the Board provide its monthly statement for June 1984, which would show the actual expenditures for the '83–84 year. The June 1982 statement had been received by the City Division of Budget on August 20, 1982, and the June 1983 statement had been received on September 26, 1983. (See City Exhibits 10, 11.) The June 1984 statement, however, was not produced by the

---

**20.** *See* Mr. Mahaney's report dated February 6, 1985, Court Ex.H.

**21.** Plaintiff's Ex. 1a, b, c and d.

Board until October 17, 1984. (Board Exhibit 23.)[22]

The delay in the June 1984 report might be accepted as an exceptional case were it not for the Board's handling of its auditors' report for the 1983–84 fiscal year. (City Exhibit 29.) This, too, was sought by various parties since late August, but through December 1984 the Board insisted that it was still being compiled by the auditors. It was not until December 19, 1984, when City Comptroller Robert Whelan was testifying, that the Court was informed by the Comptroller that he had received his copy of the auditors' report in late September 1984. The Board offered no explanation for this incident, and one is left to conclude that either the Board is becoming more inefficient each year or is demonstrating a lack of good faith in its dealings with the Court and the other parties.

## III. BURDEN OF PROOF.

There has been much discussion throughout these proceedings concerning the allocation of the respective burdens of proof. In his 1982 decision, Judge Curtin held that the Board had the burden of showing that the additional funds requested were necessary to insure compliance with the Court's orders. 547 F.Supp. at 472. The current proceedings are in the same procedural posture and the fundamental burden here remains on the Board to justify its requests.[23]

The Second Circuit's 1983 affirmance of the District Court decision has raised important questions as to how far the Board must go to meet its burden. The Circuit suggested that the record in that hearing was marginally sufficient to support an affirmance. In that hearing the main thrust of the Board's testimony related to the deleterious effect of the cuts which the Board claimed it would have to make if it

did not receive the additional $7.4M. The evidence was lacking in detail on the issue of how the Board intended to spend the money originally appropriated by the City, and equally lacking on the issue of how the City believed the Board might better spend the money it had allocated so as to meet the requirements of the Court order. The Circuit suggested guidelines in the event of future applications for Court ordered funding:

> When the School Board seeks the aid of the District Court in ordering the appropriation of additional funds to comply with a court-ordered remedy, it will normally be helpful to see precisely how the Board would expect to spend the level of funding it asserts is inadequate.
>
> . . . .
>
> No doubt such a presentation would afford the City officials an opportunity to level specific criticisms at various expenditures the Board proposes to make. . . .
>
> . . . .
>
> Should a dispute of this nature recur, we think it will normally be helpful if those who seek a court order for additional funding, and those who oppose such an order, supply the District Court with considerable detail reflecting the proposed expenditures in the absence of the additional funds claimed to be needed.

712 F.2d at 814. The City and the Board each argue that whatever burdens the Circuit established have not been met by the opposing party.

In this case, the Circuit suggested that the Board has the burden of showing "precisely how [it] would expect to spend the level of funding it asserts is inadequate." The Board's presentation should "reveal not only the items the Board expects to drop from its initial budget estimate, but also the items it expects to retain." The Board should satisfy this burden by "sup-

---

**22.** The September 1984 report was not produced in Court by the Board until February 14, 1985. (Plt.'s Ex. # 23.)

**23.** In establishing the Desmond Committee, Judge Curtin issued an order that the proceedings in front of that Committee were not to be

affected by application of presumptions or burdens of proof. (JTC order 4/10/84 p. 3.) That order does not apply to the proceedings before me either by its terms or by any reasonable implication.

ply[ing] the District Court with considerable detail reflecting the proposed expenditures in the absence of the additional funds claimed to be needed." 712 F.2d at 814.

In turn, the City should "level specific criticisms at various expenditures the Board proposes to make." If the City disagrees with the changes the Board says it must make to live within the appropriated budget, the City should show "precisely what [it] believes a line-item budget for the School Board would ... [look] like if the Board ... operate[s] on the original appropriation without making the cuts identified by [the Board]." The City should make this showing with the same "considerable detail" required of the Board. *Id.*

Applying these guidelines to the practicalities of this case raises some complicating factors. The City has made an issue of the Board's failure to provide a line-by-line budget using the initial appropriation of the City. In lieu of such a showing, the Board offered its original budget request of $192M and a list of items it said would have to be cut in order to stay within the City's initial appropriation (City Exhibit E). The City argues that this method does not satisfy the requirements of the Second Circuit.

In theory, one could take the Board's original budget request, which lays out each proposed expenditure on an item-by-item basis, reduce the line items by the amounts identified by the Board in City Exhibit E, and end up with a line item budget detailing how the Board would propose to spend the City's appropriation. This method would technically meet the City's demand that a line item budget be prepared for the original appropriated amount. This is exactly the method used by the Board in presenting its case to Judge Curtin in 1982, wherein Mr. Murray presented and testified to "a list of cuts the school system would be. forced to make from its requested $162 million budget estimate if it were obliged to live with the $150.6 million appropriated by the City defendants". 712 F.2d at 812.

There are substantive problems with this sequential list of cuts method employed by the Board. It presumes that elimination of all or part of a line item can be made, on a sequential basis, without requiring any complementary adjustment to any other line item. It seems to me that a responsible manager would not function in such a manner. When faced with a need to reduce costs, a responsible manager would consider how best to meet the organizational goals with the reduced resources and then build a budget which best accomplishes those goals given his funding constraints. Inevitably, such an adjusted budget would differ from the original budget in a number of line items, reflecting decreases, increases, additions, and eliminations of various items in an attempt to minimize the negative impact of the reduced funding. In stark contrast, the Board's method wields a sharp knife at a line item without providing any compensatory adjustments in other line items to help minimize the impact of the reduction.

The Board's method would be less open to criticism if, rather than making sequential line item cuts, it identified sequential program areas where services would have to be reduced. Identification of a program area, along with a line item listing within each area showing the various lines which support that area and how each line will absorb a proportionate share of the overall area cut, would go a long way toward providing useful information to a funding body or a reviewing court. Furthermore, such a presentation would provide the detail demanded by the Circuit and necessary for a reasoned review of the Board's actions. It is clear, however, that the Board does not presently maintain its records in such a way as to make such information, in that format, readily and regularly available. It is equally clear that the Board has resisted all efforts to get it to provide an adjusted budget which builds from the bottom up in the format which the City insists is required by the Circuit. The Board's willingness to provide volumes of information to the parties and the Court throughout the proceedings, when specifically re-

quested, does not come near compensating for the absence of the information in a format which would specifically address the needs of the City and the Court, and which if presented earlier might have obviated this extensive hearing.

However, notwithstanding the Board's unwillingness to provide an adjusted budget as sought by the City, and notwithstanding the Board's inability to provide much program-related detail by the sequential list of cuts method, I am not inclined to find that the Board has so utterly failed to meet its burden that the City is entitled to a summary decision in its favor.

Mr. Murray particularly, has testified affirmatively and convincingly as to the teaching and administrative personnel necessary to comply with this Court's orders relating to desegregation, and to the handicapped and bilingual students, and there has been much additional testimony as to non-personnel needs, all of which will be discussed later.

The Second Circuit specifically identified another burden, which the City must satisfy. The Mayor and Common Council of the City of Buffalo are named defendants in this suit who, along with the Board, were found guilty of maintaining an illegally segregated school system. In view of this, the City cannot sit back and merely make demands of its school board for information. The City is not free to steadfastly maintain its traditional procedure for allocating resources to the Board when that procedure has proven to be ineffective in maintaining compliance with the desegregation plan. Given these relentless funding disputes, the City has an affirmative obligation to participate, to an exceptional degree, in the Board's attempts to carry out the Court's orders. The role of the City which Judge Curtin and the Circuit envisioned for future budget proceedings remains clear. Regrettably, Judge Curtin's observations about the City's failure to inquire in this area are as appropriate today as three years ago:

As a defendant, it is the duty of the Mayor and Common Council, as well as the Board, to insure that the schools are effectively and completely desegregated ... As the chief executive officer of the City and as the chief fiscal officer, the Mayor has the affirmative obligation of assuring that there are adequate funds available to guarantee that this is possible... He should have affirmatively inquired as to what was necessary, what the program entailed, what were the Board's needs with regard to those programs mandated by other court orders and by the state and federal regulations... *It is clear from the testimony that the Mayor failed to make any such inquiries.*

547 F.Supp. at 478 (emphasis added).

The City has a burden to show how a desegregated school system can be maintained on the funds it appropriates and it has a duty to challenge cuts the Board proposes to make if the City believes alternative reductions are possible. The City must take affirmative steps to gather the information it needs to meet that burden. This may well require the City to engage in extraordinary measures to learn in significant detail how the Board functions, and what alternatives are available to it. It may well require observation by City staff of what in the past was exclusively a Board function.

The City's arguments concerning its lack of authority to "dictate" to the Board are unavailing here. That argument was adequately addressed and dismissed by Judge Curtin and the Second Circuit. Furthermore, the City's complaint that the information it needs is unavailable is without merit, for the City itself is partly responsible for its ignorance of the Board's operations. The history of this case is replete with instances where the City has had the opportunity to attend, observe, and participate in the Board's budget developing processes, but has refused to avail itself of those opportunities to obtain the information it needs.[24]

---

**24.** *See* Judge Curtin's discussion of this point in 547 F.Supp. at 478, et. seq. Subsequently, three

In sum, given the facts in this case, including the relevant political climate, it is not possible to apply the burden of proof as neatly as might be preferred. There are heavy burdens on both sides. Therefore, for purposes of this report, the Board is expected to be able to justify its request as reasonable and necessary. The City must show that the Board could operate without a negative impact on the desegregation plan with only the appropriation it has provided. This resolution of the burden of proof question applied to the facts here does not yield clear cut results. Nevertheless, I believe it to be the best available approach under these obviously complex circumstances.

## IV. ALTERNATIVE APPROACHES.

### A. The Desmond Committee Report.

In April 1984 Judge Curtin appointed a Budget Review Committee, referred to by all parties as the Desmond Committee after its chairman, retired New York State Court of Appeals Chief Justice Charles S. Desmond. The Desmond Committee was charged with mediating the dispute surrounding the '83–84 budget, which, as the end of the '83–84 fiscal year drew near, had not yet been resolved.

The Committee met with the parties over a period of months and in July 1984 issued its report (City Exhibit J). The Committee was unable to bring about a resolution of the budget controversy, but offered a suggested approach to a judicial resolution of the issues.

In its report, the Committee noted that a major hurdle was the difficulty in distinguishing costs required to implement the desegregation plan from those costs required simply to maintain or enhance the overall quality of the BPSS. It also noted there was general consensus among the parties that the existing quality of the educational program should not be impaired.

The Committee noted agreement among the parties that the school year 1981–82 could be used as a base year because in that year the City and Board agreed on the Board's funding level, and Phase IIIx of the desegregation plan had been substantially implemented. The Committee suggested that the Court could limit its inquiry by focusing on the changes in the budget request since 1981–82. Five categories of reasons for budget increases were identified by the Committee, and it suggested that the Court determine for each increase whether it was required:

(i) to implement the desegregation plan;

(ii) to comply with other State or Federal mandates (e.g., in respect to education of handicapped children);

(iii) to maintain the quality of the educational program;

(iv) to enhance the quality of the educational program; or

(v) for some other reason.

The Desmond Committee noted that 80% of the Board's costs were personnel related, and suggested that the dispute might resolve itself if agreement among the parties was reached on the issue of personnel

---

annual budgets have been developed by the Board and presented to the City. The Mayor's first look at these budgets has continued to be February 1, with the traditional 5 or 6 days of public hearings before the Mayor presents his recommendation to the Council. There has been absolutely no evidence presented in the 50 days of hearings before me, or the countless days of settlement discussions, that the Mayor had made any serious attempt to comply with his court-ordered responsibility to make himself aware of the legitimate needs of the Board other than the pitifully inadequate review it is accorded during the public hearings. Although, at the Mayor's insistence, this Court directed the for-

mation of a Mayor's Committee to review Board practices, there is no indication that if such a committee was formed, it ever functioned.

During the course of settlement discussions in the Fall of 1984 the City took the position that there could be no meaningful resolution of the issues presently before the court unless a lasting solution was formulated which would prevent these disputes in future years. In response, the Board offered to allow representatives of the City to observe the budget formulation sessions then going on in preparing the 1985/86 budget request and invited ongoing comments and criticism of its methodology. The City declined the invitation to participate.

costs. However, the Committee met with failure in its attempt to have the Board and City agree on the personnel status of the Board. The City asked for actual personnel counts by job title (i.e., English teacher, music teacher) but the Board was unable to provide actual counts by any narrower classification than "function costs" (i.e., elementary schools instructions or academic high schools instructions). As a result of the lack of detail, the City was unwilling to accept the Board's figures.[25]

The Desmond Committee noted that there were some personnel increases over the 1981–82 level which were not related to the increased costs associated with handicapped education. It suggested the Court conduct a hearing on the issue of the necessity of the increases since the parties had been unable to reach any agreement. After the necessity of the increases had been determined, the Committee suggested that the items found not to be related to the desegregation efforts could be disallowed by the Court.

The Committee found itself in the same position in which I find myself here with respect to the issue of desegregation costs. The Board listed all its budget increases and classified them into the various categories suggested by the Committee. Significantly, in the Board's view, none of the increases is for the exclusive purpose of enhancing the overall quality of the educational system, a purpose for which the Court could not order increased expenditures.

Given the relatively brief time frame in which the Committee functioned, the clarity with which the major issues were identified and addressed is a tribute to the wisdom of its members. In practice, however, it is a testimonial to the complexity of the technical and political issues involved that the hearings envisioned by the Committee grew into the six months of discussions and 50 days of testimony before me.

Some of the items suggested by the Committee are worthy of special note. Its suggestion that 1981–82 be considered a "base year" for purposes of analyzing increases in the budget was the premise upon which the Court's expert, Mr. Mahaney, developed his assumed model.[26] Its suggestion that at the hearings the Board be required to explain its reasons for the particular increases and the City in turn be required to present evidence in rebuttal as to the items it disagrees with generally conforms to the hearing scenario envisioned by the Second Circuit in its decision, and generally conforms to the allocation of the burden of proof which I have found appropriate, though elusive, in these hearings. Finally, the Committee's identification of the disagreement over personnel costs as a primary stumbling block is similar to my conclusion in this report.

### B. The Assumed Model.

Mr. Mahaney, the Court appointed expert, prepared an exhibit for the Court, Court Exhibit G, which he termed an "assumed model". According to Mr. Mahaney, the model was conceptually similar to economic projections or forecasts which accountants occasionally prepare for their clients, with one significant difference. While a projection or forecast begins with present or historical data and projects that data into the future, the assumed model began with historical data and projected that data only up to the present. Mr. Mahaney admitted he had never had occasion to prepare such a model in the past, and qualified its utility by noting that the validity of the model was based on accepting the various assumptions which he set out in the notes to Court Exhibit G.

Mr. Mahaney suggested the assumed model's primary utility was as a guide to show the interested parties what any particular expense of the Board in 1981–82 would look like if carried forward into

---

25. In the hearings before me, Mr. Murray, who was ill at the time of the presentations before the Desmond Committee, also disagreed with the figures presented by the Board.

26. Mr. Mahaney was also a member of the Desmond Committee.

1984–85. The year 1981–82 was picked as a base year at the suggestion of some counsel (and as indicated by the Desmond Committee) mainly because that was the last year in which the Board and City had agreed upon a Board budget, and because Phase IIIx was substantially implemented by the end of that year.

Simplistically, the assumed model can be viewed as projecting in 1984–85 dollars the costs incurred by the Board in operating the school system in 1981–82, with qualifications. A major qualification is the cost of handicapped education. The model recognizes that these costs have risen in the past three years through a combination of increases in the mandated programs required, and increases in the numbers of students who have been identified as qualifying for handicapped education. Accordingly, the model accepts at face value the Board's actual expenditures for the years '81–82 through '83–84 in the budget lines which are designated specifically for handicapped education.

The model reflects some sophisticated analysis of other Board budget lines in order to arrive at appropriate percentage increases from year to year. For example, in the area of teachers' salaries, the wage increases agreed to through the bi-annual collective bargaining process are frequently reported as simple percentage increases in the teachers' base salary. In fact, since the Board and teachers have agreed to a complex wage table which credits the teachers for both longevity and increased post-graduate educational achievements, the cost of a particular wage agreement may be more than the simple percentage which has been reported. The model takes that factor into consideration. In the area of teachers of the handicapped, no percentage increases are posted since the actual

costs of those programs were carried forward as discussed above. The model also considers salary adjustment factors and additional teaching positions as more fully explained at pages IX and 1 of the model.

## V. THE BUDGET REQUESTS.

### A. The 1984–85 Budget.

The overwhelming emphasis during the 50 days of hearings was on the Board's budget request for the fiscal year 1984–85. The parties operated on the assumption that the '84–85 budget request was the proper focal point since the Board could theoretically alter its practices to conform with any decision of the Court prior to the end of the fiscal year. Obviously, there was nothing the Board would be able to do to alter the way it had operated during the '83–84 fiscal year, which ended a month before these hearings began.

The concentrated focus on the '84–85 budget request, which lasted for almost the entire '84–85 fiscal year, provided a unique parallel opportunity to hear the courtroom testimony with regard to the budget request while observing the reality of the Board's and City's operation during that same fiscal year.

Before the hearings began, the Court directed the parties to confer in an attempt to settle the case. At the conclusion of those discussions, each side maintained its original position. The Board asserted it could not maintain the desegregation plan without its requested $192M, and the City insisted that $176M was sufficient.

During the early days of testimony, Mr. Reville maintained that $192M was the absolute minimum required.[27] However, on August 16th, after five days of testimony, and when the opening of the schools was imminent, the Board agreed that it could

---

27. Mr. Reville was cross-examined by Mr. Weiss, the Mayor's attorney on August 2, 1984:
  Mr. Weiss: Is it possible—Well, let me ask you this: Are the budget requests that you made, are they real hard budget requests?
  Mr. Reville: Yes.
  Mr. Weiss: Is there any fat in them, if you know what the word means?

  Mr. Reville: No.
  Mr. Weiss: And, so it's your statement that when you ask for X dollars you've got to have that number of dollars?
  Mr. Reville: Yes.
  (Tr. 2–211)

operate on a budget of $189.2M, and the City agreed to increase its appropriation to $179.2M. The $3.6M reduction comprised the first seven items set out in City Ex. E.

The first of those items was $2M from line 1990–499, Reserve for Contingencies. In fact, the Board had already accepted its auditor's suggestion that the money, used for a retroactive salary payment after the signing of a collective bargaining agreement, should be considered part of the '83–84 budget and deleted from the '84–85 budget request. The Board knew before the first day of testimony that it was going to make this adjustment.

A second item was $640K for 40 Teachers of the Handicapped, lines 2250–150 and 2255–150. Prior to August 16th, Mr. Reville had testified that the additional teachers were required to implement the mandates of a New York State regulation which required a reduction in the class size for handicapped students. Subsequent to August 16th, the testimony revealed that even before the settlement discussions in July 1984, the Board was aware that the effective date of the regulations had been postponed for at least one year, thus eliminating the need for some of the additional teachers in '84–85.

Furthermore, when the Board reduced its total number of employees in order to arrive at the $3.6M reduction (a total of 95 positions), the Board also reduced the estimate for its Social Security payments by $95K. In fact, the Board's budget examiner, Mr. Campagnolo, estimated that the reduction of 95 employees would yield a savings of over $200K in Social Security payments. The Board took only a $95K reduction in this line because that was all that was necessary in order to achieve the $3.6M reduction and did not deduct the full savings that were realized from the elimination of the personnel.

When asked to describe the areas it would have to reduce in order to live within the City's appropriation, the Board again demonstrated a lack of candor in its representations to the Court and the parties. Some of the areas the Board stated would

be cut were the athletic program, transportation, and teacher aides, which it also said were vital to the success of the desegregation plan. Yet, the evidence showed that the Board had a surplus in an Unemployment Insurance line of $800K, for which it was requesting an additional $550K, and which had not experienced any history of annual expenditures in excess of approximately $500K. Also, in the budget lines for Light and Power, the Board had spent $800K less in the past two years than it had requested, yet neither of these areas was on the Board's list of potential reductions. Here the Board apparently identified the areas which would generate the loudest public outcry if they were eliminated while overlooking some less painful opportunities, which were not obvious to an outsider, to reduce its demands.

After 50 days of testimony with no change in the position of the Board as to its needs, a stipulation signed by all parties except the Mayor was filed, indicating that the Board believed it could carry out the desegregation plan in '84–85 with an O & M budget of $185M. The stipulation contains no indication of what the Board would eliminate from its '84–85 request to achieve this goal.

Finally, a significant problem throughout these hearings was the Board's failure to have documented in a readily accessible manner the increases it sought in its budget. The budget document itself contains only the tersest explanation for changes in budget requests. Nothing accompanies the budget document to explain in detail the justification for the requested amounts. Instead, the Board goes to its public meetings, its Common Council hearings, and into this Court, and states its general needs, without giving any detailed explanation until specifically requested.

If the Board had been candid in setting out its required needs in the pre-hearing settlement discussions, in complying in good faith with directions to produce a proposed budget indicating how it would spend the City's appropriation, and in maintaining and timely producing records which

clarify rather than confuse, this hearing would have been shorter, and more importantly, the suspicion and antagonism so prevalent between the principal parties and their counsel might also have been reduced.

While the City may well have been justified in looking with suspicion on the Board's bald statement of needs, the City, in its own way, contributed to the lack of cooperation in these proceedings.

For four years now the City has challenged the Board's budget requests. The City has taken its case to the courts before, including the Supreme Court of the United States, and lost every time. The opinions in previous court decisions are full of illustrations of where the City has failed in its responsibilities as a defendant in this suit, and suggestions as to how it should get involved in its role as the funding authority. Yet in the hearings before me the City failed to carry out its duty to affirmatively challenge the Board's budget request. Were it not for the meticulous cross-examination conducted by the Plaintiffs and Intervenors and the records generated by the Court's expert, the record would contain little detail as to the spending by the Board in relation to specific requests.

Of most concern is the City's failure to present an affirmative case. It hung its case on its belief that the Board had all of the burden, and it had none. The City called no expert witnesses to contradict the Board's witnesses. The City did not even call its own budget examiners who were responsible for reviewing the Board's budget. It was left to the Plaintiffs and Intervenors to make the City's case for it by calling Mr. Rehak and Mr. Cotroneo, the only persons the City had who might have been able to level reasoned criticism at the Board's operations.

Despite the lack of any foundation, the City insisted on making arguments which were theoretically valid but which were doomed to failure for lack of evidentiary support. For example, the City repeatedly argued that the Board could effect a savings by increasing the number of children per classroom. After this question was initially raised to the Board witnesses, it became clear that the concept of pupil/teacher ratio is complicated by the existence of the great number of handicapped students in both isolated and mainstream classrooms. Although class size records were entered in evidence by the City, there was no analysis of them made which would be of any assistance in making a finding as to proper class size or pupil/teacher ratios. The City, unable to make its point through cross-examination of Board witnesses, failed to call anyone to clarify the issue, yet insists even in its brief that the Court should order a budget reduction on the basis of pupil/teacher ratios.

The City also argued that the Board could be more efficient in its overall operations and thus save money; in theory a valid point. However, the City called no witness to testify on this point. The City argued, without any evidentiary support, that because the Board might have been inefficient in the past, its past budgets ought to be reduced as a penalty for past inefficiency. Not only does the argument lack any logical basis (the money spent in a previous year, rightly or wrongly, cannot be recovered), but the City produced no witness to show how the Board could specifically eliminate some inefficiency in the future so as to effect a legitimate savings in years to come.

In another example, the Board indicated to Mr. Mahaney that with only a few exceptions, all of the positions added to the Board's budget were related to implementing the desegregation program or to the increase in the services required to be provided to the handicapped students. Counsel for the Mayor challenged Mr. Mahaney for accepting that statement without investigation, yet again the City produced no witness to cast any doubt on the Board's assertions.

This attitude is a carry-over from the actual dealings of the City with the Board. An example is provided by the annual appropriation. The City bases its recommended budget for the Board not on what the Board has historically spent, but on

what the City has historically appropriated. As the gap between the Board's request and the City's appropriation grows, the City's proposed appropriation falls further and further away from meeting the legitimate needs of the BPSS. And, similar to its courtroom failure to call witnesses in support of its position, the City has failed to take any good-faith steps at getting involved in the Board's budgeting process to understand the actual needs of the Board.

Since there is clearly an absence of cooperation on the part of both the Board and the City, the question of how to evaluate the Board's request in light of the City's appropriation is a difficult one. Neither side has been persuasive in convincing me that its budget amount is the product of a well-reasoned process.

The Board's budget is comprised of two distinct elements, personnel and non-personnel related expenses. Mr. Mahaney indicated that he considered the personnel expenses the most significant since they amount to roughly 80% of the Board's entire budget. Yet at least half of the testimony and exhibits dealt with the 20% of the budget in non-personnel lines.

Two methods of reviewing the Board's non-personnel budget items surfaced during the hearings. First, Court Exh. B (Mr. Mahaney's Special Report # 1), a four year history of the Board's budgeted amount compared to the actual expenditures in each line, provides a starting point to identify some potential problem areas.

This process reveals instances where the budget requests are consistently in excess of historical actual expenditures;[28] where funds are requested for projects subsequently not undertaken;[29] where funds are requested for projects arguably not necessary under the desegregation plan;[30] where the Board has consistently failed to modify its estimating procedures after history has shown those procedures yield excessively high estimates;[31] where funds are requested despite a sufficient reserve already existing in a trust and agency account;[32] and in which lines are poorly defined and not consistently maintained from year to year[33]. After this kind of analysis, it is possible to identify anywhere from one to several million dollars where the Board has failed to justify its budget request.

A second method leads to roughly the same result. Presumably, if the money was not used in the budget line for which it was requested, it was transferred out into a different line, and either used in that line, or encumbered at the end of the year. As discussed above under the subject of encumbrances, the Board clearly adopted a policy of using any available funds at the end of the year by encumbering them. Because of the excessive amount of encumbrances occuring in the month of June,[34] it is reasonable to conclude that those funds which are accumulated throughout the

---

28. *See, e.g.,* line 2030–154, Sick Leave Administration, in which at least $30K has been appropriated for the last four years and nothing has ever been spent. The money was transferred out to different lines each year.

29. *See, e.g.,* line 2101–120, Elementary School Faculty, in which $560K was requested in '83–84 for 36 teachers to provide art, music and physical education in the primary grades. These teachers were never hired, but the money was not returned to the City.

30. *See, e.g.,* line 1629–418, in which $120K was requested to build a bus-turnaround—no doubt a useful improvement, but I doubt that it is essential to the desegregation plan. As of November 23, 1984, the money had not been expended (City Ex. 5).

31. *See, e.g.,* line 9010–800, in which the formula promulgated by the State for estimating the

amount of Civil Service pension is historically too high, and in which the City had offered to provide the Board with a more precise formula which would have resulted in a reduction in the request of over $400K.

32. *See, e.g.,* line 9050–800, in which annual estimated expenditures were $400K to $500K, the reserve fund had a balance of $800K, and yet the Board was requesting $550K for the year.

33. *See, e.g.,* lines 2100–582 through 2100–599 in which it is impossible to discern any pattern of expenditures or rationale for the line numbering changes in these supply accounts.

34. In June 1984 the Board encumbered over $1M dollars in the 1629 account alone.

year are encumbered so that they do not revert to the City. It is also reasonable to conclude that since these funds were used to meet "unfunded needs" of the Board, that at the time the Board developed its budget it did not believe those needs were sufficiently crucial to the desegregation plan so as to require that they be included in the budget. Accordingly, since the Board has failed to distinguish its budgeted end-of-the-year encumbrances from the encumbrances it makes to satisfy so-called "unfunded needs", it can reasonably be concluded that the budget request for money used to fund the end-of-the-year encumbrances has not been satisfactorily justified. This method yields potential savings of several million dollars.[35]

Unfortunately neither method is completely satisfactory since each inevitably is flawed by imperfect information. While perfect knowledge is admittedly unattainable, in this case the complexity of the issues and the way the funding for one line is intertwined with that of countless others through the transfer and encumbrance process makes the margin for error unacceptably large.

Furthermore, this analysis has been limited almost exclusively to the non-personnel segment of the Board's budget.[36] The same methodology fails when one tackles the 80% of the Board's budget which is personnel related.

Mr. Murray was the spokesman for the Board in the personnel area. I give great weight to Mr. Murray's testimony as to the numbers of teachers and support personnel necessary to operate the BPSS. This weight is substantially increased by the City's complete failure to produce any evidence contrary to Mr. Murray's testimony.

As the only expert witness on the subject of personnel, Mr. Murray's testimony stands unchallenged. On the record before me I must accept his assertion that the personnel increases over the past few years have been related to the increases in handicapped or bilingual services required by the Court and the State, or for implementation of Phase IIIx. The record reflects that although the total student population decreased in the BPSS, the number of handicapped students had increased from 7900 in 1981 to 9430 as of June 30, 1984, and the number of bilingual students increased from 1339 to 1585 over the same period.[37] He testified as to the increased requirements mandated by the State for all handicapped and bilingual students, and the effect on the BPSS of continuing compliance with the *Andres*[38] and *Bushey*[39] orders. In each case his testimony as to the requirements and the personnel needs to meet those requirements is essentially unchallenged.

Based on the present record, there is little else in the personnel area subject to question. The City provided no useful evidence on the subject of pupil/teacher ratios, failed to significantly challenge the Board's administration of its personnel system, and left it to Mr. Mahaney to identify the possibility that some of the personnel policies, such as sick leave, should be looked into for possible savings. What is left is Mr. Murray's testimony, and very little other detail. It is noteworthy that Mr. Mahaney observed that every hundred personnel who are added cost the Board $2.5M, yet the Board offers little detailed support aside from Mr. Murray, and the City provides no affirmative challenge to what evidence the Board does produce on

---

**35.** From an accounting standpoint the possible reductions identified by analysis of the over-budgeted accounts cannot simply be added to the possible reductions identified through analysis of the encumbrances because in at least some cases the same money that was not used in a particular line ultimately ended up as an end of the year encumbrance. Adding the two amounts would have the effect of reducing the budget request twice for a single discrepancy.

**36.** Salary lines cannot be encumbranced.

**37.** *See* Court Exs. E, p. 4 and D, p. 7.

**38.** *Andres v. Reville,* CIV 80–482C (W.D.N.Y. May 27, 1982).

**39.** *Bushey v. Reville,* CIV 81–254C (W.D.N.Y. Oct. 23, 1981).

this, the most significant single area in the Board's budget.

In the light of this evidence after 50 days of hearings, Mr. Mahaney's assumed model and the stipulation of all parties except the Mayor takes on added importance. The assumed model is based on the testimony of Mr. Murray that all the personnel who were added were somehow related to handicapped and bilingual education or the desegregation plan. The fact that the assumed model's estimated '84–85 expenditures in the personnel area are within 1% of the Board's request[40] lends credibility to both the assumed model and the Board's estimate in the personnel area.

In the non-personnel area, the assumed model conforms to the earlier analysis of overbudgeting and encumbrances in which anywhere up to several million dollars could be found as not justified by the Board. Specifically, the assumed model in '84–85 is less than the Board's non-personnel budget request by approximately $3.6M.

All parties except the Mayor essentially adopted the assumptions in the model by setting the $185M amount as the appropriate amount in their stipulation. The plaintiffs were evidently of the belief that their requirements could be met with this amount and the Common Council, the funding agency, evidently believed, after hearing the evidence, that the stipulated amount was necessary. The failure of the Mayor to introduce evidence in support of his argument that fewer personnel should have been added since 1980–81 eliminates that issue as a factor in the review of the model.

I also recognize that by its very nature a budget request is at best an estimate of the amount required in the future, and absolute precision is unattainable. Thus alternative approaches to a determination of an appropriate budget cannot be reasonably distinguished on the basis of results when the differences in those results are in the range of one or two percent of the amount finally considered by the Board and Council as being necessary.

For these reasons, on the record before me, after considering the testimony, the exhibits, the stipulation, and the model, I conclude that a budget of $185M in Operating and Maintanance funds for the year '84–85 is a reasonable amount upon which the Board can satisfactorily carry out the requirements of the desegregation plan.

**B.  The 1983–84 Budget.**

Analysis of the '83–84 budget request is similar to the previous analysis of the '84–85 budget request with the additional factor that the amount the Board actually spent in '83–84 is available for consideration.

The Board requested $172.3M for '83–84 and the City appropriated $158.8M. The Board operated throughout that fiscal year on a spending plan which called for the expenditure of the $172.3M. As the end of the fiscal year approached, the Board sought and received an advance of an additional $8.7M from the City which allowed it to complete the year. The issue before me is essentially to determine how much, if any, of the $8.7M should the City be directed to appropriate to the Board.

The Board argues that the City should be required to appropriate the entire $8.7M on the grounds that all of it was necessary to carry out the desegregation plan. The City argues that none of the overspending was justified, and that the Board should be con-

---

| 40. | | | | |
|---|---|---|---|---|
| | Model: | Total Personal Services: | $107.9M | (Ct.Ex.G, p.6) |
| | | Additional Positions Adj.: | 3.9M | (Ct.Ex.G, p.1) |
| | | Model TOTAL: | $111.8M | |
| | Board's 1984/85 Request: | | 112.5M | (Plt. Ex.21, p.64–S) |
| | | Difference: | .7M | |

sidered as having accrued an $8.7M deficit for '83–84.[41]

The proof on the subject of '83–84 expenditures was largely indirect, resulting from comparison of the '84–85 budget request for a particular line with the budget request and actual expenditures for that line in '83–84. In the area of personnel, Mr. Murray testified substantially as he had for the '84–85 budget request, that personnel employed in the Instructional Division were required in support of the desegregation orders and other mandated programs. Again, the City failed to introduce any substantial evidence in opposition to Mr. Murray's testimony, and there is therefore no basis in the record for questioning his conclusions.

As to non-personnel items in '83–84, there was less detailed testimony than in '84–85. However, what evidence there was generally remained unchallenged by any evidence from the City. The City made no showing that the funds it had appropriated were sufficient for the Board's operation, and had no proof indicating that funds spent by the Board were not necessary except as hereafter noted.

For the reasons discussed above relative to the '84–85 request, the assumed model can be given substantial weight,[42] especially when considered in light of the uncontroverted testimony of Mr. Murray.[43]

I thus find that with the following exceptions the additional moneys advanced to the Board were necessary to comply with the desegregation order of this Court:

1) As previously discussed, Mr. Clapp, the Deputy Superintendent for Finance, Personnel and Research, testified that at the end of the year the Board's practice was to encumber uncommitted funds by

**41.** There was much discussion throughout the hearings on the subject of the ultimate Board deficit. Beginning the '83–84 fiscal year, the Board was carrying a deficit of approximately $7M. If the $8.7M received from the City in May 1984 is considered an appropriation, the Board would not incur an additional deficit for the '83–84 year. If, however, the $8.7M was found not to have been necessary, and the City is not required to appropriate that amount at this time, then the Board will have incurred an additional deficit of over $8M in '83–84, bringing its accumulated deficit as of '84–85 to approximately $15M.

The testimony indicated that under an existing State law, the Board is required to retire its deficit over five years by setting aside 20% of the deficit amount in each of the five years. Since this money is in addition to the Operating and Maintenance funds required to run the BPSS, each year the City must appropriate to the Board sufficient O & M funds plus 20% of the existing deficit.

If the deficit going into '84–85 is in the $7M to $8M range, the deficit retirement amount would be roughly $1.6M, the amount suggested in the stipulation. If the deficit is in the $15M range, the deficit retirement amount would approach $3M per year. The deficit amount is the only substantial issue which I can see that requires a determination of the '83–84 budget dispute. For all practical purposes, that money is already spent, and the only issue is how it is going to be funded. Ultimately, the City is responsible for all of the Board's obligations in any event. It has been suggested that I consider the impact of the deficit as a factor in my determination of the '83–84 budget request. The impact, as I understand it, is significant. If the City is required to fully fund the $8.7M for '83–84, the City must find some way of securing that money immediately. If, however, the $8.7M is considered a Board deficit, then the City can spread out the funding of the Board's deficit over the 5 year period, tempering somewhat the present impact on the City treasury. The Board has expressed no great concern over the consequences of the decision on the City's fiscal position, arguing that as a matter of principle the Board should not be found to have incurred a deficit in '83–84, notwithstanding the potential benefits to the City of Buffalo as a whole. Regretably, just as the issue of affordability of the desegregation plan cannot play a part in this decision, the effect of the allocation of the deficit is likewise irrelevant to the immediate question before me. It is a factor the City and Board management are free to consider in their out-of-court administration of City and Board finances, but once the question is placed in the hands of the courts, the focus becomes markedly narrower.

**42.** The Mahaney model estimated expenditures of $165.9M for '83–84. Actual expenditures reported by the Board were $168.5M. Part of the $2.6M difference between these figures is attributable to a portion of the cost of additional positions over model levels as explained at p. 1 of Ct.Ex. G.

**43.** The model gains further support from the fact that its '82–83 assumption is within 2% of the amount found by the Court to be required for that year.

allocation to contemplated projects so that there would be no fund balance at the end of the year. As of June 30, 1984 the sum of $2.2 was encumbered. The May and June 1984 monthly statements show that in the last month of the '83–84 fiscal year, the Board encumbered an additional $1.1M in the Building Maintenance and Repairs account 1629. The Board has not offered any explanation as to how in May 1984 it could claim it was $8.7M short of meeting its '83–84 requirements, and within thirty days generate $1.1M in encumbrances in one account alone. I am well aware that some end-of-the-year encumbrances are a normal part of budget operations. In this case, however, the excessive end-of-the-year encumbrances have been severely questioned by the City and the Court, and the Board has not satisfactorily explained any of them as being required to comply with Court orders and mandates. Accordingly, I find that the City should not be required to appropriate additional funds to cover the amount of $2.2M. 2) At the time the Board was facing its fiscal crisis in May 1984, it knew that there was a surplus fund balance in the Trust and Agency account set up for unemployment insurance, and that it had an additional $550K in its '83–84 budget for that account (line 9050-800). The Board made no attempt to reduce its funding request to the City by re-allocating the $550K to a needed purpose, and was unable in court to give any reason why such a re-allocation should not have been made. I therefore find that the City should not be required to appropriate funding to cover that amount.

In sum, the Board, has failed to justify $2.750M of its $8.7M advance for 1983–84. Therefore, the City should be required to appropriate an additional $5.950M for '83–84.

## VI. COMMENTS.

The earlier judicial decisions in this case have regularly admonished the parties to resolve their differences by other than court action. To date those admonishments have fallen on deaf ears. While I, too, believe that the best interests of the parties and the citizens and children of the City of Buffalo would be served by a renewed effort at cooperation between the Board and the City, the history of this case suggests this may not be the last time the issue is before the Court. So that the parties and future courts might benefit from the lengthy hearings in this case, I take this opportunity to make the following observations.

Both the Board and the City have failed to fully recognize their respective responsibilities in light of the desegregation order. The Board regularly argued that comparison of its operation to that of other school systems was irrelevant unless a showing was made that the other school system was also a "desegregating school system", on the presumption that the desegregation orders set up unique standards for the Board to meet. Yet the Board just as regularly replied to inquiries from the Court or the City that the information requested was not available in the format desired because the Board had never needed to keep the information that way for its own use, or had never been required to keep that information by the State or Federal governments. The Board cannot have it both ways. If it continues to seek additional funding from the City on the basis of the desegregation orders, and seeks the support of the Court for that funding, it must in turn accept the responsibility of providing the additional records and justification needed by the Court and City to evaluate the Board's requests.

Additionally, the Board must accept the limits of its authority. As far as the Federal courts are concerned, the City, if it so desires, can have a lower quality school system so long as that system remains in compliance with the orders of this Court and with the State and Federal mandates affecting education. To that extent the quality of the BPSS is properly determined by the citizens of Buffalo, through their elected representatives on the Common

Council and in the Mayor's office. In making their decision about the desired quality of the BPSS, the citizens and elected officials have a legitimate right to expect the Board to accurately portray the consequences of operating the BPSS at a funding level suggested by the City. When the consequences are fairly and accurately portrayed, the citizens, the City, and the Court can make reasoned decisions as to the propriety of the Board's requests.

█ The City, in turn, cannot continue to treat its evaluation of the Board's budget requests as if the Board was just another City department. The City is a co-defendant in the suit with the Board and shares equally the responsibility to assure the schools remain desegregated. This places an additional burden on the City to actively participate in the Board's operations, to familiarize itself with the various needs of the Board, and to be in a position to offer justifiable constructive criticism and reasonable alternatives if it disagrees with a Board decision.

There are a number of specific areas in which the Board could improve its budget processes. One of the most important is in the area of justification. The Board would be well advised to adopt the suggestion of the Board's auditor's management letter for the year ended June 30, 1984 (City Ex. 30) that each budget request increase in excess of 5% be specifically and separately identified and explained, and in turn provide that explanation in a legible format to the City. From what I have seen throughout this hearing, the Board's written justification and explanation to the City for its various budget request increases were

mostly inadequate. For example, some teachers are paid from accounts different from the one which specifically describes their duties. This practice protects the teachers' salary increments as they alternate jobs. However, it also makes it virtually impossible to determine the cost of a particular program or subject. In detailed testimony, Mr. Murray explained this system satisfactorily for the '83–84 and '84–85 years. But such detailed explanation after the fact, not available to the City in writing while the budget is being approved, is of little help in bringing about a mutually agreeable budget.[44]

Similarly, the lack of a budget presentation, which explains the costs of particular programs, hampers an understanding of the Board's objectives. The Board has an obligation to identify the costs associated with installation of new or upgraded programs which it claims are related to a court or government mandate. For example, effective September 1984 the operation of School 36 and the Herman Badillo School (School 76) were combined to provide an Early Childhood Program at School 36 and an Academy Program at Badillo as a necessary part of the continuing implementation of Phase IIIx. This required a net additional staff of 11.5 positions and a total expenditure of $493K exclusive of the fringe benefits. (Pltf. Exh. 8) Witnesses for the Board testified that this amount was included within the '84–85 budget request. However, there is nothing in the Board's budget request document or the presentation to the City which explains this increase, and the lines affected by it. Since the City does not dispute the necessity of the increase, it is reasonable to assume

---

**44.** A related point causes some concern about the Board's presentation at these hearings. In response to the City's inquiry, Mr. Murray delivered to a City employee a package of back-up documents which he said supported the '84–85 instructional division requests. The voire-dire of the City's witness by Board counsel on the admissibility of these admittedly Board produced documents consumes 28 pages of testimony. (Tr. 23–115 to 23–143). Ultimately, the documents were marked as City Exhibit II.

One of the documents was a request that the number of library aides be increased from 13 in

'83–84 to 25 in '84–85 at an estimated cost of $254K, without reference to a specific line account. Both the '83–84 and '84–85 budget lines for 2610, Library Services, request only one non-certified employee. It is apparent that there were 13 library aides employed during '83–84, but there is no way of determining from the document or from the budget the line from which they were paid. There is also no readily apparent way of determining how many are employed for '84–85.

that if it had been specifically identified there would have been one less area of disagreement between the parties. The Board would likely find less opposition to its requests if it was more open in explaining its increased needs.[45]

In his order of February 23, 1979, Judge Curtin refused to order restoration of the Art, Music and Physical Education programs in the primary grades as part of the desegregation plan. In '83–84, 36 teachers were added to the budget request for this program, but the program was never implemented. The roughly $600K requested for the program was spent elsewhere. These teachers and funds were not needed or requested in the '84–85 budget. I note that in the corresponding line for the '85–86 budget (2110–121) there is another request for an additional 36 teachers. The budget document does not indicate the specific area of their employment and the question as to their need is not before me. This is however an example of how lack of detailed explanation of the Board's needs can contribute to the controversy surrounding its final appropriation. There is also the question as to whether the Court, if ultimately forced to resolve the issue, would require implementation of a program if the BPSS has been able in the last few years to maintain the desegregation plan without it. The same question might arise to the 7th and 8th Grade Summer School which, while funded in 1983–84, was not implemented. The '85–86 budget evidently seeks its reimplementation.

The Board should also revise its budget preparation process to minimize the occurrences of some of the questionable budgeting practices which have been identified at the hearing. The City, as the funding body, is entitled to expect that when the Board presents a line-by-line budget request, the Board intends that the funds sought for a particular item are reasonably needed for that item, and are not intended for some other purpose. When, as here, there is a consistent pattern of requests which are higher than actual expenditures, with year-end transfers to other underfunded lines, the suspicion arises that the Board is being less than candid in its requests. If the Board anticipates greater needs for a particular item it should say so, rather than create an atmosphere of distrust by massive transfers of funds from requested but unneeded items to those which it hesitates to openly request.

The Board should recognize that there has been much attention focused on its end-of-the-year encumberances. In future years the Board's continuing inability to provide detailed explanations for each of the end-of-the-year encumberances should point clearly to the conclusion that the Board has continued with its practice of encumbering funds at year end to avoid returning any unused portion to the City.

The Board should take a close look at its various supplies accounts. These accounts, scattered throughout the budget and given different titles, create a great deal of confusion to a reviewing body. The Board should recognize that the area of supplies is typically of interest to a funding body, and create a straightforward system which will explain the amount of money expended in these lines, the balance of goods remaining in inventory at year end, and the anticipated needs for the next year.

The Board must also accept the fact that, based only on its performance in providing up-to-date financial reports to the Court during this hearing, its financial reporting system is in serious need of repair. Mr. Mahaney's assertion that sound financial management requires timely financial reports was not disputed by the Board, yet the delays in production of the monthly reports and other financial information compel the conclusion that the Board is exercising mediocre financial management at best. In support of the need for improved financial reporting methods, the Board should hire a consultant familiar

---

**45.** Evidently the principal of Badillo was not formally advised of the change until August 1984 and the Board of Education did not vote to approve it until after it had taken place. (Tr. 27–72, 174.)

with state-of-the-art financial data process-ing methods to help the Board overhaul its financial department, and then follow up to insure the suggestions are implemented.

The City suffered throughout these hear-ings because of its failure to have any proof to support assertions it made. The City criticized the Board for its inefficien-cy, argued that pupil/teacher ratios were a relevant statistic, doubted Mr. Murray's as-sertions that increased personnel were in support of handicapped or desegregation related programs, and disputed the Board's claim that desegregation costs could not be isolated from other costs. Yet the City produced no evidence in support of its as-sertions. In the future, the City should either refrain from using such arguments in defense of its low appropriation, or pre-pare itself sufficiently in advance to be able to substantiate its allegations.[46]

The City's lack of preparedness for the hearings is symptomatic of the City's fail-ure to honor its obligation to insure that the BPSS is adequately funded. If, as history has indicated, the City chooses not to expend the personnel resources neces-sary to adequately familiarize itself with the Board's needs, the City should hire an independent auditor to assume the City's duties with respect to the Board. Only then will the City be able to defend its appropriation as the product of a well-rea-soned decision making process. Anything less than full involvement by the City con-demns it to repeated failures in its at-tempts to restrict the growth of spending by the Board.

On a more specific level, the City might consider assuming the costs of the Board which are essentially nondiscretionary.

For example, in the area of Fuel/Coal/Oil/Gas, Light Power, and Wa-ter (Lines 1629–421, 425, 427), the Board spent roughly one million dollars less than its request of $7.5M in '83–84, and on the last day of the fiscal year transferred $900K to other accounts. It is impossible to determine what specific items these funds were used for. These items pro-voked much discussion and controversy in the hearings because the volume of trans-fers and the history of excess budgets com-pared with actual expenditures suggested the possibility that these funds were used as reserves for other Board programs which the Board had not wanted to justify in its original request. If the City accepted the responsibility for funding these items outside of the Board's budget, the total size of the Board's budget would decrease, leav-ing that much less for dispute at the annu-al budget hearings.

If six months of discussions and 50 days of courtroom testimony can be summa-rized, there is one undeniable conclusion which can be drawn. No practical budget amount will be determined without court intervention unless there is complete coop-eration between the City and the Board of Education. No realistic amount can be de-termined and agreed upon when under the present system only a few days are spent by antagonists in discussing the system's needs. There must be continuing commu-nication and disclosure between the Board and the City throughout the year. Re-course to the Court to resolve these dis-putes is expensive to the taxpayer, harmful to the students because of the absence of school personnel while attending the Court proceedings, and of dubious value to the

---

**46.** I note that the Board is requesting 3,624 certified employees for the year 1985–86, an increase of 245 over the final '84–85 request and an additional 60 non-certified employees. (Plt.Ex. 21, p. 64–S.) The fact that I find that the number of teachers requested in the '84–85 budget is justified should not be considered as a concession that any increases requested by the Board for '85–86 should automatically be grant-ed. My findings as to the personnel needs for the current year are based on the evidence presented in these hearings. The Board testi-

618 F.Supp.—20

fied to its needs, and the City did not introduce any substantial contrary evidence. In the fu-ture, the Board should anticipate the necessity of identifying the specific program the addition-al positions are requested for, and the impact on the desegregation plan if the positions are not added. Since personnel make up 80% of the Board's budget, the City should focus its atten-tion on these personnel increases and be pre-pared to defend, with facts, its rationale for not honoring the Board's request.

community as a whole when the Court is forced to assume the responsibility which should be shouldered by the Board and the City.

**RECOMMENDATION.**

Based on the evidence submitted in this hearing, it is recommended that an order be entered directing the Mayor and the Common Council of the City of Buffalo—

(1) to provide the Board of Education an additional sum of $5,950,000 for its Operations and Maintenance Expenses for the fiscal year 1983–84; and

(2) to provide to the Board of Education a total sum of $185,000,000 for its Operations and Maintenance Expenses for the fiscal year 1984–85, together with such additional sums as are required by law to apply in reduction of the Board's deficit.